## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

AIRLINES REPORTING CORPORATION,     :     CIVIL ACTION

        Plaintiff,     :

        : 

        v.     :

        :     NO. 2003/146

ANGELA BELFON, RONALD BELFON, and     :

VERNE DAVID,     :

        : 

        Defendants.     :

## MEMORANDUM

RONALD L. BUCKWALTER, S.J.                September 15, 2010

## Table of Contents

I.    Introduction

II.    Statement of Material Facts

     A.    General Background of Parties

     B.    The Start of WWT's Relationship with ARC and the General Requirements of the ARA

     C.    Evidence of Defendants' Knowledge or Lack Thereof Regarding WWT's Operations

     D.    WWT Fails to Comply with Its Obligations under the ARA

     E.    WWT's Bankruptcy

III.    Procedural History

IV.    Ronald Belfon's Motion to Dismiss

     A.    Standard of Review on a Motion to Dismiss

     B.    Discussion

       1.      Whether ARC Has Standing to Pursue Its Claims

       2.      Whether ARC is a Real and Substantial Party to the Controversy for Purposes of Subject Matter Jurisdiction

       3.      Whether the Court Has Subject-Matter Jurisdiction Over This Case

  C.     Conclusion

V.    Plaintiff ARC's Motion for Summary Judgment

  A.     Standard of Review on a Motion for Summary Judgment

  B.     Plaintiff's Evidentiary Objections

       1.      Deposition Testimony of Angela and Ronald Belfon

       2.      Affidavits of Felicia Maduro and Eleanor Garcia

       3.      Expert Report of M. Martin Mercer

  C.     Discussion of Merits

       1.      Breach of Fiduciary Duty

            a.     Sources of Defendants' Fiduciary Duties

                i.     Defendants' Duties as Officers and/or Directors of an Insolvent Corporation

                ii.    ARA as an Express Trust

            b.     Whether Any Defendant Breached His or Her Fiduciary Duty to WWT

                i.     Angela Belfon

                ii.    Verne David

                iii.   Ronald Belfon

                    a.    Involvement in the ARC Bond as Facilitator and Indemnitor

                     b.     Active Involvement in WWT's Administrative and Financial Management

                     c.     Use of Status as a Director to Control WWT During Bankruptcy

                     d.     Giving of False Testimony to Obstruct ARC's Claim to the Remaining Proceeds in WWT's Designated Account

                     e.     Conclusion as to Ronald Belfon

          2.     Conversion and the Participation Theory of Liability

     D.     Conclusion as to Plaintiff ARC's Motion for Summary Judgment

VI.     Ronald Belfon's Motion for Summary Judgment

     A.     Evidentiary Objection to the Declaration of Ronald Belfon

     B.     Whether a Genuine Issue of Material Fact Exists as to Ronald Belfon's Liability

          1.     Summary of Evidence Regarding Ronald Belfon's Involvement

          2.     Breach of Fiduciary Duty

          3.     Conversion, Fraud, Common Law Conspiracy, Breach of Corporate Fiduciary Duty, and Tortious Interference with Contract

     C.     Conclusion as to Ronald Belfon's Motion for Summary Judgment

VII.     Conclusion

## I.  INTRODUCTION

Currently pending before the Court are (1) the Motion to Dismiss by Defendant Ronald Belfon; (2) the Motion for Summary Judgment on Counts I, II, and III by Plaintiff Airline Reporting Corporation; and (3) the Motion for Summary Judgment by Defendant Ronald Belfon, together with several tangential motions. For the following reasons, Ronald Belfon's Motion to Dismiss and ARC's Motion for Summary Judgment are denied, while Ronald Belfon's Motion for Summary Judgment is granted in part and denied in part.

## II.  STATEMENT OF MATERIAL FACTS

### A.  <u>General Background of Parties</u>

The facts relevant to this case have been the subject of extensive briefing by the parties referencing numerous pages of exhibits. Having fully reviewed: (1) Plaintiff Airlines Reporting Corporation's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment, the Response of Defendant Angela Belfon, the Response of Defendant Ronald Belfon, the Reply of Plaintiff to Ronald Belfon's Response, the Reply of Plaintiff to Angela Belfon's Response, and Ronald Belfon's Sur-reply Brief; (2) Defendant Ronald Belfon's Statement of Undisputed Facts in Support of his Motion for Summary Judgment and Plaintiff's Response; and (3) the numerous exhibits included in binders or attached to the various filings by the parties, the Court sets forth the following summary of the facts as supported by the record.[1]

---

[1] To the extent that a factual statement by a party is supported by the evidence cited and is undisputed by the opposing party, the Court references the cited evidence. To the extent a factual statement by a party is disputed by the other party, the Court will either take note of the evidentiary conflict or make a factual finding that the evidence supports only one party's version. The Court will not, despite the parties insistence, make credibility findings.

Notably, on several occasions in its Statement of Facts, Plaintiff either cites to evidence or pages of a deposition that it has not provided or fails to identify the precise portion of a broad

Plaintiff Airlines Reporting Corporation ("ARC") is a Delaware corporation whose stockholders are the principal scheduled airlines of the United States. (Ex. 1, Dep. of Deborah Erickson 18-20, Aug. 29-20, 2005 ("Erickson Dep.").)[2] It accredits travel agents on behalf of airlines to have a unified program of reporting and remitting, *i.e.* a settlement company. (Id. at 18:17-22.) Other airlines that are not shareholders participate in ARC by signing an agreement to participate as a carrier, and allow travel agents to validate tickets and settle those tickets on a weekly basis. (Id. at 20:11-22.) These airlines pay ARC for their services. (Id. at 21:1-7.)

ARC provides both an accreditation program for designating agents in the United States, Puerto Rico, and the Virgin Islands for the sale of worldwide air transportation and a computerized system – the Agent Standard Ticket and Area Settlement Plan – through which agents report sales and report proceeds thereof to the airlines concerned. (Erickson Dep., Ex. 48B, Aff. of Deborah Erickson ¶¶ 2-3, Oct. 7, 2002 ("Erickson Aff.").) The travel agents pay an annual fee to cover ARC's costs. (Erickson Dep. 22:2-12.) ARC and the accredited travel agents enter into a contract known as the Agent Reporting Agreement ("ARA"). (Erickson Aff. ¶ 4; Erickson Dep. 23:5-24:1, Ex. 1, pt. 4 ("ARA").) This document governs the issuance of the ARC traffic documents to the agents, how the agents may issue those traffic documents to customers, how the agents remit sums to participating carriers, and the consequences of an agent's failure to account for proceeds. (ARA; Erickson Aff. ¶¶ 5-11; Ex. 1, pt. 3.)

---

document that it cites. Where the factual assertion made in connection with those citations is disputed, the Court will decline to accept the assertion as true. Where it is undisputed, the Court will accept the fact as true.

[2] The parties have coordinated the numbering of their exhibits so that they are sequential with one another, leaving the Court with one complete set of exhibits. As such, the Court shall refer to each exhibit by number only without reference to which party produced it.

World Wide Travel ("WWT") is a Virgin Islands corporation started in 1985 as a travel agency. (Ex. 2, Dep. of Angela Belfon, 10:19-11:25, Dec. 13, 2005 ("A. Belfon Dep.").) The company's first shareholders were Defendant Angela Belfon, Joanne Williams, and Hyacinth James, who was Williams's mother. (Id. at 11:1-23.) Aside from being a shareholder, Defendant Angela Belfon was also an officer and director of WWT. (Id. at 11-12; Ex. 3, Dep. of Ronald Belfon 8:4-16 & Ex. 1-2, Dec. 14, 2005 (R. Belfon Dep.").) Defendant Ronald Belfon was additionally listed as an officer and director of WWT, and served as an attorney and member of the Virgin Islands bar. (A. Belfon Dep. at 12:1-5; R. Belfon Dep. at 8:4-9:22.) Finally, Defendant Verne David served as an officer and director of WWT. (A. Belfon Dep. 12:1-14; Ex. 4, Dep. of Verne David 9:1-14, Aug. 23, 2005 ("David Dep.").) As the company was originally structured, Joanne Williams was responsible for the financial end of the business, including balancing the checkbook and reporting sales to the airlines. (A. Belfon Dep. 12:22-13:2.) Mrs. Williams was also in charge of preparing WWT's tax returns, prior to her passing in 1997. (Id. at 19:22-24, 34:16-35:1.)

## B.    The Start of WWT's Relationship with ARC and the General Requirements of the ARA

Prior to 1999, travel agents in Puerto Rico and the Virgin Islands obtained ticket stock through the Agent Reporting Plan ("ARP"), which did not involve ARC. (Erickson Dep. 27:3-17; R. Belfon's Resp. to Pl. ARC's Statement of Undisputed Facts ("R. Belfon Resp. to PSUF") ¶ 8; A. Belfon's Resp. to Pl. ARC's Statement of Undisputed Facts ("A. Belfon's Resp. to PSUF") ¶ 8.) In 1999, the accredited travel agents in Puerto Rico and the Virgin Islands were "grandfathered" or "converted" into the ARC program. (Id.)

On August 6, 1999, Defendant Angela Belfon, acting on behalf of WWT, executed the conversion agreement and Memorandum of Understanding, effectively incorporating the ARA and becoming qualified with ARC. (Erickson Dep. Ex. 213; A. Belfon Dep. 30:2-31:12 & Ex. 130.) This conversion agreement was notarized by Defendant Ronald Belfon. (A. Belfon Dep. 31:4-12 & Ex. 130.) Under the ARA, WWT became an agent for the airline carriers, under which it was authorized to issue ARC traffic documents. (ARA § 1.) The ARA required WWT to maintain a surety bond for the joint and several benefit of the carriers and ARC in the amount of $50,000. (ARA § 4.1; Erickson Dep. 57:14-20.) WWT obtained its first bond from United States Fidelity and Guaranty ("USF&G") on August 24, 1999, which was secured by an indemnity agreement containing the signatures of Angela Belfon, Ronald Belfon, and Hyacinth James. (A. Belfon Dep. 11:1-22; Ex. 8, Dep. of John Filice, 8:15-16:14 & Ex. 1, June 4, 2008 ("Filice Dep.").) Ronald Belfon, however, explained that he never personally signed the agreement, but that, at his request, his name was executed for him by Angela Belfon. (R. Belfon Dep. 18:1-19:7; 20:3-6.) Angela Belfon also testified that Ronald Belfon had no role in obtaining the bond. (A. Belfon Dep. 38:3-7.) The only officers or agents who had the access or authority to send financial information for the bonding company were bookkeeper Eleanor Garcia, Verne David, and Angela Belfon. (Ex. 11, Second Dep. of Felicia Maduro, 69:1-70:8, May 23, 2008 ("Maduro Dep. #2".)

In order to qualify for the bond, WWT needed to convert and organize its finances. (R. Belfon's Resp. to PSUF ¶ 15; A. Belfon's Resp. to PSUF ¶ 15.) Defendant David, CPA Clifford Charles, and WWT General Manager Felicia Maduro had some input into converting WWT's accounting from a manual system to a computerized system on QuickBooks. (David Dep. 66:7-

67:13; Ex. 7, Dep. of Clifford Charles 11:9-12:13, June 4, 2008 ("Charles Dep.").) Mr. Charles further assisted with the ARC bond by referring Mrs. Belfon to Colin Wilson, a New York attorney with an office in the same building as Charles and with whom he shared some clients. (Charles Dep. 29:22-31:5.)

WWT maintained two checking accounts at a St. Thomas branch of Banco Popular de Puerto Rico ("BPPR"). In the QuickBooks system, BPPR account #193-331879 was labeled an "escrow account" and BPPR account #193-333671 was labeled an "operating account." (Ex. 9, Dep. of Felicia Maduro, 30:2-24, 36:9-13 & Exs. 6-7 (Mar. 12, 2003) ("Maduro Dep."); David Dep. 63:15-64:15; A. Belfon Dep. 83:23-84:3) Both BPPR's Vice President and Commercial Manager for Tortola and St. Croix, Stanley Olive, and BPPR's Vice President and Manager of Credit Administration, Raymond Green testified, however, that they were not aware of any "special" or escrow accounts, that they understood both accounts to be operating accounts, and that neither was an escrow account, regardless of how the account was actually labeled by WWT. (Ex. 42, Dep. of Stanley Olive, 8:4-7, 47:2-48:2, 49:18-20, Nov. 4, 2003 ("Olive Dep."); Ex. 43, Dep. of Raymond Green 7:12-15, 24:6-26:9, Nov. 4, 2003 ("Green Dep.").)

As required by Section VIII.A.1 of the ARA, WWT designated BPPR account #193-331879 as the account into which all proceeds of sales on ARC traffic documents would be deposited and against which ARC's area bank would be authorized to draw checks for payment to ARC of the traffic documents. (the "designated account"). (Maduro Dep. #2 17:1-21; A. Belfon Dep. 15:23-16:23, 84:4-85:19.) WWT used the ARC traffic documents to print air passenger tickets from WWT's computers for clients, each of which had three copies: one for the client, one for WWT as agent, and one for ARC as auditor (the "auditor's coupon"). (A.

8

Belfon Dep. 14:7-15:22; Maduro Dep. 22:13-26:24.) The client would pay WWT for the ticket and, as required by Section VIII.A.2 & 3 of the ARA, WWT would submit a weekly report to ARC listing the ticket sales and attaching all the auditor's coupons. (Maduro Dep. 24:2-25:15.) In addition, the report included a settlement authorization form to ARC, which allowed ARC to directly draw specified amounts from WWT's designated account for payment of the traffic documents. (Id. at 26:10-27:5; ARA VIII.A.2 & 3.) The reports were to be submitted within the period ending date or "PED," and anything late would be deemed out-of-period reporting, delaying ARC's ability to debit the cash. (Ex. 12, Dep. of Richard Jones 87:9-20, Aug. 29, 2005 ("Jones Dep."); A. Belfon Dep. 118:3-16; Maduro Dep. 36:14-37:14.) The weekly Agent reports would be processed by ARC's area bank and, on the tenth day after the close of each reporting period, ARC's area bank would issue a direct electronic debit against WWT's account for all proceeds due based on the amount stated in the settlement authorization form. (ARA § VIII.A.8; Erickson Dep. 209:2-12.) As WWT's reporting period ended on a Sunday, ARC's debit day for WWT fell on a Wednesday. (A. Belfon's Resp. to PSUF ¶ 21; R. Belfon's Resp. to PSUF ¶ 21.)

An unreported sale ("URS") occurred when an agent failed to report a sale on an ARC traffic document in the weekly report for the sale period. (Maduro Dep. #2 14:15-18.) If a URS was later reported, it became an out-of-period reporting ("OPR") and ARC could assess a compensatory fee of $23.00 for each URS. (Maduro Dep. 36:20-37:14.) Upon processing each weekly sales report, ARC mailed an Agent Sales Summary to WWT, summarizing the amount due to ARC, the carriers for cash sales, the amount due to the agent for commissions, the amount of credit card sales, and all discrepancies such as OPR sales. (Erickson Dep. 35:15-37:11, 49:4-14; Maduro Dep. #2, Ex. 134.)

9

Under section VIII.D.1.a of the ARA, in the event of dishonor of a draft by ARC's area bank, the Agent had to immediately provide ARC with a certified check or wire transfer to cover that draft. (ARA § VIII.D.1.a.) Should the Agent fail to do so, ARC would be authorized to withdraw from the Agent all ARC traffic documents, notify the system providers to inhibit the transmission of ticketing records for the printing of such onto ARC traffic documents (paper format) by such Agent, and prohibit the use of ARC traffic document numbers by system providers for the issuance of ARC traffic documents (electronic format) on behalf of such Agent and so notify the carriers. (Id.) Section XV of the ARA sets forth a lengthy, but non-exhaustive list of situations in which it would appear to ARC that there may be or has been fraudulent conduct on the part of the Agent, authorizing ARC to take any of the aforementioned steps. (Id. § XV.)

C.    **Evidence of Defendants' Knowledge or Lack Thereof  Regarding WWT's Operations**

Joanne Williams, until her untimely death in 1997, Angela Belfon, and Verne David were all authorized signatories on the designated account. (A. Belfon Dep. 21:2-3 & Ex. 6; Ex. 13, Dep. of Eleanor Garcia, 13:20-24, Dec. 10, 2008 ("Garcia Dep.").) Eleanor Garcia was hired in 1986 as WWT's part-time bookkeeper doing payroll; W-2 and 1009 forms, and assisting Verne David in preparation of tax returns, balance sheets and income statements. (Garcia Dep. 9:5-23, 17:2-15: A. Belfon's Resp. to PSUF ¶ 30; A. Belfon's Resp. To PSUF ¶ 30.) She prepared tax returns, handled payroll taxes and gross receipts tax reporting, prepared income statements and balance sheets, and was responsible for reporting operational costs. (Garcia Dep. 11:4-18, 24:16-25:14.) When Ms. Williams passed away in 1997, Ms. Garcia continued performing her job

10

normally, but did not know who took over the filing of the tax reporting statements. (Id. at 25:15-27:13.) Also in 1997, Felicia Maduro became general manager of WWT and was primarily responsible for the preparation of weekly reports to ARC. (Maduro Dep. 9:2-10:3; Maduro Dep. #2 5:10-21.) Her supervisor and the person to whom she reported was Angela Belfon. (Maduro Dep. 10:4-6; Maduro Dep. #2 5:22-25; A. Belfon Dep. 121:12-20.) Although Maduro testified that Mrs. Belfon was always advised of the amount stated in the settlement authorization form before the weekly reports were mailed, Mrs. Belfon repeatedly denied having any involvement in preparation of the reports other than physically mailing them. (Maduro Dep. #2 44:1-4; A. Belfon Dep. 121:15-20, 130:8-13.) Indeed, Mrs. Belfon testified that Ms. Maduro was solely responsible for making reports to ARC. (A. Belfon Dep. 34:9-35:9.)

WWT had access to computer systems designed for travel agents known as A.D.S. and Sabre. (Maduro Dep. #2 10:23-11:16; A. Belfon Resp. to PSUF ¶ 34; R. Belfon Resp. to PSUF ¶ 34.) When WWT generated tickets for customers on ARC traffic documents, the ticket sale and commission income information automatically came into the system through these computer systems, which could then be accessed to determine the total amount owed by WWT to ARC. (Maduro Dep. #2 10:3-11:23; A. Belfon Resp. to PSUF ¶ 34; R. Belfon Resp. to PSUF ¶ 34.) Ms. Garcia testified that she personally had access to the computer system. (A. Belfon Resp. to PSUF ¶ 35; R. Belfon Resp. to PSUF ¶ 35.)

WWT earned its income through a commission on processing airline tickets. (Garcia Dep. 17:16-21; David Dep. 72:17-24.) To collect money from the client for the ticket, WWT would process either cash, credit card, or government requisition sales. (Maduro Dep. 24:15-16.) WWT had its own merchant account to process credit card sales. (A. Belfon Dep. 81:19-82:1.)

If a customer charged a ticket using the WWT merchant account, the bank would make a direct electronic transfer of cash to WWT's account. (Maduro Dep. 24:14-25:8; A. Belfon Dep. 82:2-7.) A customer could also use the Airline Merchant Account to purchase a ticket, at which point the case would go directly to the airline and would be reported to ARC as a cash sale. (A. Belfon Dep. 82:8-24.) Angela Belfon understood that if WWT received the cash from the sale, ARC could not debit the account for that sale until it received a settlement authorization form. (Id. at 105:4-14, 118:9-12.) She further understood that WWT had an obligation to submit the report to ARC at the specified time, so as to authorize ARC to debit WWT's account for the sales. (Id. at 129:2-13.)

ARC offered the ability, and in fact encouraged its agents, to submit the weekly sales reports electronically, through a system called IAR Plus. (Maduro Dep. 37:20-38:8 & Ex. 13.) Felicia Maduro advocated the use of electronic reporting to make her job easier. (Maduro Dep. #2 55:15-56:15.) WWT switched to an electronic reporting system in 1999, but switched back to a manual system less than six months later. (Maduro Dep. 38:9-24.) Maduro understood that WWT returned to manual reporting because it was having financial difficulties. (Id. at 38:25-39:24.) She further indicated that the decision was made by Angela Belfon, who communicated it directly to ARC. (Id. at 39:13-24.) Angela Belfon, however, denied ever discussing the benefits of electronic reporting with Ms. Maduro or anyone else. (A. Belfon Dep. 81:11-18.)

From June 26, 2001 to June 26, 2002, Ronald Belfon acted as WWT's attorney with respect to debt collections both by and from the agency. (Ex. 15, Response to Interrogatory No. 1.) Mr. Belfon also provided advice regarding the legal status and rights of parties in the Travel and Tourism Academy, which was operated under a related corporation and trained persons to be

certified as travel agents. (Id.) Finally, he provided counsel and reviewed documents involving Winair, a foreign commuter airline that used WWT as its local agent for ground handling and other matters in St. Thomas. (Id.) According to Felicia Maduro, Mr. Belfon worked as the legal advisor for the business if there was any litigation or threatened litigation, but was not involved in financial matters. (Ex. 32, Aff. of Felicia Maduro ¶ 8, Oct. 26, 2005 ("Maduro Aff.").)

Ronald Belfon, along with Angela Belfon and Verne David, also held valid travel agent ID cards issued by the International Airline Travel Agents Network ("IATAN"). (Ex. 16, Dep. of Deborah Thompson 21:20-24:15 (Aug. 29, 2003) ("Thompson Dep."); R. Belfon Dep. 108:19-21; A. Belfon's Resp. to PSUF ¶ 49; R. Belfon's Resp. to PSUF ¶ 49.)[3] To retain these cards, Mr. and Mrs. Belfon and Mr. David submitted yearly renewal applications certifying they were either employees or independent contractors of WWT that devoted at least twenty hours a week to the business of the agency in the preceding year. (Thompson Dep. 30:9-36:18, 40:25-43:22; David Dep. Ex. 14; R. Belfon Dep. 110:10-112:10 & Ex. 143.) Ms. Garcia was responsible for filling out the forms for IATAN and regularly listed Ronald Belfon as an independent contractor based upon his legal work for WWT and his work soliciting customers. (Ex. 34, Aff. of Eleanor Garcia ¶ 10, September 23, 2005 ("Garcia Aff.").) Although Ms. Garcia never discussed the content of those forms with him, (Garcia Dep. 115:8-116:20), Mr. Belfon admitted that he devoted at least twenty hours per week to the business of WWT and received at least $5,000 in compensation per year. (R. Belfon Dep. 110:7-19.) He explained that his twenty hours were devoted to strictly legal work for WWT. (Id. at 111:5-13.) Both Ms. Maduro and Ms. Garcia

---

[3] IATAN is an organization for travel agents to join and receive benefits such as a travel agent ID card. (Thompson Dep. 18:7-20:14.)

averred that Mr. Belfon rarely came to the business office of WWT, had absolutely no involvement in the financial aspects of WWT, such as the reporting to ARC or the accounting of ticket sales, and did not remove any funds for his personal use. (Maduro Aff. ¶¶ 5-6, 10; Garcia Aff. ¶¶ 5-8.) He also did not have any check-writing authority, as that authority was vested solely in Angela Belfon and Verne David. (Maduro Dep. #2 96:15-24; Pl.'s Reply to R. Belfon's Additional Facts ¶ 139.) Notably, however, Maduro later admitted that she did not really know whether Mr. Belfon came in at nights or on weekends, whether he had anything to do with reviewing balance sheets or tax returns, or whether he had any involvement in the running of WWT. (Maduro Dep. 92:12-94:14.)

As to WWT's year-end financials, several individuals were involved. Maduro would provide information about sales and income from the forms WWT received, Garcia was responsible for information about operating expenses, and David would provide information for loan receivables, leasehold improvements, depreciation, and liabilities. (Garcia Dep. 34:14-40:3.) Mrs. Belfon testified that Ms. Maduro was solely responsible for preparation of the balance sheets. (Id. at 60:11-17.) Most of the documentation was prepared by her and, according to Mrs. Belfon, none of these documents were provided to the Belfons for their general information. (A. Belfon Dep. 60:18-61:6.) Ms. Maduro, however, stated that she never prepared balance sheets or had anything to do with profit and loss. (Maduro Dep. #2 38:11-15, 49:8-50:5.) To the best of her knowledge, Verne David was responsible for balance sheets. (Id. at 50:3-5.) Tax returns were prepared by an outside accountant, but signed by Angela Belfon. (A. Belfon Dep. 61:9-18.) By her own admission, Mrs. Belfon did not review the returns before she signed them. (Id. at 61:19-63:25.)

**D.  WWT Fails to Comply with Its Obligations under the ARA**

On or about March 21, 2001, BPPR honored an ARC debit while the designated account had been in overdraft on and off for a period of three months. (Olive Dep. 57:2-61:19.) The bank made a decision to honor that ARC debit, but followed up with a warning letter to Mrs. Belfon, dated March 22, 2001. (Id. at 57:2-58:22, 62:22-63:2; A. Belfon Dep. 102:17-103:5.) The letter indicated that if the overdraft was not covered within five days, the bank would not honor WWT's next ARC debit. (A. Belfon Dep., Ex. 115.)

Following these events and up until June of 2001, WWT began not sending in their weekly sales reports on timely basis, not reporting sales, and engaging in out-of-period reporting. (Erickson Dep. 31:17-32:17; Jones Dep. Exs. 300-301.) These events resulted in ARC's decision to conduct an on-site compliance audit at WWT's offices. (Id.) Between June 18 and June 21, 2001, ARC auditors Richard Jones and Robert Rosario Cruz conducted this audit and discovered several hundred out-of-period tickets and/or unreported sales, as well as several missing and unaccounted for tickets. (Jones Dep. Exs. 303-304; Erickson Aff. ¶ 12; Maduro Dep. 44:5-45:15.) As a result of these findings, Mrs. Belfon immediately presented the ARC auditors with a certified check in the amount of $283,577.66, drawn on the designated account and for full payment to ARC of all amounts demanded by the auditors. (Jones Dep. 63:16-64:2; A. Belfon Dep. 107:17-108:16 & Ex. 121.) ARC elected, at that time, to allow WWT to continue under its contract due to what ARC believed was an acceptable reason for the late reports and unreported sales, *i.e.* the illness of the manager's mother. (Erickson Dep. 40:18-41:11.) Indeed, Ms. Maduro testified that, in 2001, she had not been there much since due to her mother's illness and death. (Maduro Dep. #2 102:10-22.) During the audit, Mrs. Belfon provided the ARC auditors

15

with an executed Statement of Ownership form, identifying Angela Belfon, Ronald Belfon, and Verne David as owners. (A. Belfon Dep., Ex. 103.) That document originally listed Mr. Belfon and Mr. David as doing thirty-five hours of work per week for the agency, but those numbers were subsequently crossed off without explanation. (Id. at 76:14-20 & Ex. 103.) Ronald Belfon claimed to have not been aware of this audit until after the filing of the present lawsuit. (R. Belfon Dep. 32:7-18.)

On June 20, 2001, BPPR honored ARC's draft for the PED June 10, 2001 in the amount of $239,942, causing WWT to end that date with an overdraft of $180,652.70 in the designated account. (Ex. 14.) From June 20, 2001 until February 5, 2002, WWT was repeatedly in overdraft, either in the designated account or the operating account. (Id.) Moreover, Plaintiff's expert, David O'Connell opined that WWT was insolvent from the period of December 21, 2000 to December 31, 2001.[4] (Ex. 18.) Notwithstanding this possible insolvency, WWT issued checks, during the period of March 19, 1999 to May 30, 2001, totaling $46,000 and payable to "Ronald and Angela Belfon" as "loan reimbursement." (A. Belfon Dep. 42:5-45:1 & Ex. 21.)

_____

[4] Defendants argue that the Court may not consider the expert report from O'Connell because it is unsworn and does not qualify as a declaration or affidavit that is admissible on summary judgment. (A. Belfon's Resp. PSUF ¶ 63; R. Belfon's Resp. PSUF ¶ 63.) The Third Circuit has found that an expert report that is neither attached to an affidavit or deposition of the expert is not competent to be considered on a motion for summary judgment. Fowle v. C&C Cola, a Div. of ITT-Cont'l Baking Co., 868 F.2d 59, 67 (3d Cir. 1989); see also Bock v. CVS Pharmacy, Inc., No. CIV.A.07-412, 2008 WL 3834266, at *3 (E.D. Pa. Aug. 14, 2008). However, while Plaintiff improperly failed to attach any affidavit or deposition to Mr. O'Connell's report in its Statement of Undisputed Facts, Defendant Ronald Belfon subsequently provided the transcript of O'Connell's December 8, 2009 deposition in which he authenticated his expert report. (R. Belfon's Resp. to PSUF, Ex. 38, Dep. of David J. O'Connell, 85:13-90:5, Dec. 8, 2009 ("O'Connell Dep.").) Moreover, Plaintiff's Sur-reply Brief attaches, as Exhibit 48, an affidavit from Mr. O'Connell. (Ex. 48.) As these documents satisfy the standard set forth in Fowle for admission of the report, the Court will consider the report.

Felicia Maduro was told by Mrs. Belfon that these checks were repayment of a loan from her husband.[5] (Maduro Dep. 54:12-24; Maduro Dep. #2 78:1-79:22.) Angela Belfon, however, testified that she alone made a loan to WWT in the amount of $92,000. (A. Belfon Dep. 42:5-45:1, 50:2-51:6.) She further indicated that she never discussed the financial situation of the company with either Mr. Belfon or Mr. David and never had any conversations with Mr. Belfon regarding the overdrafts or other financial problems. (A. Belfon Dep. 49:4-19, 103:24-104:3.) Similarly, Ronald Belfon stated that the first he ever heard about this loan was in the context of the lawsuit. (R. Belfon Dep. 24:7-23.) Finally, Ms. Garcia testified that, in preparing WWT's year-end reports, she never saw any expenditures to Ronald Belfon.[6] (Garcia Dep. 113:1114:15.) According to Plaintiff's expert, as of December 31, 2001, the $92,000 Belfon loan was repaid in full, but no supporting evidence exists to bolster his conclusion.[7] (Ex. 18 at 4.)

The ARC Bond was a continuous bond subject to cancellation if WWT failed to pay its yearly premium and provide yearly financial statements. (Filice Dep. 16:6-19:24.) Ms. Maduro was the individual responsible for filling out the bond renewal applications. (Garcia Dep. 89:6-

---

[5] As to Defendant Angela Belfon, this testimony, which would otherwise be hearsay, is admissible as a statement by a party-opponent under Federal Rule of Evidence 801(d)(2). As to Defendant Ronald Belfon, however, this testimony is inadmissible. Although Plaintiff cites to Federal Rule of Evidence 803(6) – a hearsay exception for records of regularly conducted activity – it fails to establish how Ms. Maduro's testimony fits within that exception, particularly given the one-time nature of the loan. Accordingly, the Court relies on this testimony only as against Angela Belfon and declines to consider it as evidence against Ronald Belfon.

[6] Plaintiff's expert could not verify who supplied the $92,000 "stockholder loan." (O'Connell Dep. 32:2-19.)

[7] Defendants dispute this fact with citations to testimony from both Mrs. Belfon and Ms. Maduro. Notably, however, neither individual knew or could recall whether the loan was paid off. (Maduro Dep. #2 79:23-80:2, A Belfon Dep. 59:18-60:10.)

10.) Insurance agency Duffy & Poscillo ("Duffy") inherited the bond in 2000 and processed WWT's 2000, 2001, and 2002 renewals upon receipt of financial statements from WWT. (Filice Dep. 9:20-16:18 & Ex. 1.) As of December 31, 2000, WWT owed ARC at least $213,074 for ticket sales on ARC traffic documents, which had either not yet been reported to ARC, or had not yet been processed by ARC's area bank and debited from the balance. (Ex. 18.) WWT's balance sheets, however, showed that it had $70,776 in cash in the bank and did not reflect any deficit to ARC for more than that amount in tickets sold but not yet reported and paid prior to the end of 2000. (Filice Dep. 24:11-25:18.) John Filice, of Duffy, indicated that had WWT's balance sheet shown this obligation to ARC in the amount of over $200,000, the bond would not have been renewed. (Id. at 23:18-24:8.)

On November 29, 2001, Winston Williams, widower of Joanne Williams, commenced a lawsuit against WWT, Angela Belfon, Ronald Belfon, and Verne David resulting from WWT's alleged refusal to pay off a loan obtained by Mrs. Williams for the benefit of WWT in 1992, which was collateralized by a certificate of deposit owned by her mother, Hyacinth James. (A. Belfon Dep. Ex. 34.) Mr. Williams noted that Angela Belfon and Joanne Williams were very close until Joanne's untimely death in 1997. (Ex. 19, Dep. of Winston Williams 27:5-11, Sep. 25, 2008 ("Williams Dep.").) The two couples – Angela and Ron Belfon, and Joanne and Winston Williams – would often socialize and have frequent discussions about the finances of WWT. (Id. at 114:5-115:13.) Ron Belfon was always a "full and active participant in any discussion about WWT's financial condition and their various plans to obtain financing for WWT." (Id. at 114:1-4.) After Mrs. Williams's death, Ronald Belfon became even more involved with WWT's finances, but found that WWT's financial condition in disarray. (Ex. 9 at

RB782-786.) Both Mrs. Williams's mother, Hyacinth James, and Mr. Williams began to put

pressure on the Belfons to pay off the loan so that the CD pledged as collateral could be released.

(Williams Dep. 28:4-32:11.) At every meeting regarding the amounts Mr. Williams claimed was

due to him, Ronald Belfon was "the active participant." (Id. at 37:1-9.) Mr. Williams also noted

that Ronald Belfon was always intimately involved in meetings where they were attempting to

find ways in which WWT could resolve issues relative to the financial dilemma it was facing.[8]

(Id. at 105:18-24.) Ronald Belfon, however, denied such involvement.[9] (R. Belfon Dep. 13:11-

15:7.)

On other fronts, WWT's financial problems continued. As of December 31, 2001, WWT

had a liability to ARC of at least $226,274 for sales on ARC traffic documents through that date,

which had either not yet been reported to ARC, or not yet processed and remitted to carriers.

(Ex. 18.) Moreover, WWT had a negative balance of -$2,868 in the designated account. (Id.) In

---

[8] Defendants object to any reliance on Williams's testimony as speculative, based on hearsay, and not based on personal knowledge. They also claim that the Court should not take his statements as conclusively true because he is obviously a biased and interested witness. (R. Belfon's Resp. to PSUF ¶ 72; A. Belfon's Resp. to PSUF ¶ 72.) Aside from these blanket statements, however, Defendants provide no viable, legal explanation for their objections. Indeed, upon reading Mr. Williams's deposition, the Court finds that he did have personal knowledge and was not so clearly biased as to make his testimony unreliable. Accordingly, the Court overrules Defendants' objections.

[9] Plaintiff argues in its Reply Brief that the testimony of Angela and Ronald Belfon is self-serving, after-the-fact testimony that should be disregarded. The United States Supreme Court, however, has made clear that self-serving testimony may be utilized by a party at summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (noting that a non-moving party may create an issue of fact by proffering his or her own affidavits). Merely because the testimony of Defendants is self-serving does not render it inadmissible. Waldron v. SL Indus, Inc., 56 F.3d 491, 501 (3d Cir. 1995).

　　　To the extent that Plaintiff also objects to the entirety of this testimony as inherently contradictory, the Court discusses this objection in more detail later in this opinion.

late January 2002, Angela Belfon received a letter from Stanley Olive of BPPR echoing the warning made in the March 22, 2001 letter, as follows: "Please be advised that if the aforementioned overdrafts totaling $143,003.13 are not covered, the Bank may not be in a position to honor weeks's ARC debit." (Id. at 112:2-113:19 & Ex. 31.) As a result, Angela Belfon entered into a $266,000 loan agreement with BPPR, secured by a second mortgage on the home she shared with Ronald Belfon in St. Thomas. (A. Belfon Dep. 111:20-24 & Ex. 32.) Ronald Belfon signed the mortgage to convey his spousal homestead rights to the mortgagee. (Id.; R. Belfon Resp. to PSUF ¶ 76.) According to Mrs. Belfon, however, she never discussed this loan with her husband. (A. Belfon Dep. 48:14-19.) Similarly, although Ronald Belfon admitted to knowing that the loan was to be used for WWT, he did not ask why WWT needed the money. (R. Belfon Dep. 25:10-26:6.) The loan closing occurred on February 5, 2002, with both Mr. David and Mr. Olive present. (A. Belfon 114:23-115:8; David Dep. 107:4-15.) The proceeds of the second mortgage were used directly pay off three demand loans to BPPR in the name of WWT. (A. Belfon Dep. Ex. 32, at bppr-000322.) Ronald Belfon received a copy of the February 5, 2002 loan documents, and initialed and executed the mortgage. (R. Belfon Dep. 27:15-28:8.) Plaintiff's expert found nothing improper about the February 2002 loan. (O'Connell Dep. 31:2-13.)

Approximately three weeks after the loan closed, WWT was once again in overdraft as a result of receivables due from the government. (Olive Dep. 9-25.) Accordingly, from March to June 2002, WWT again began a pattern of late and OPR reporting to ARC. (Erickson Dep. 434:4-43:22, 201:11-203:22; Jones Dep. 72:12–77:14, 87:4-89:21; Ex. 20.) The majority of tickets that WWT reported in May were for OPR sales relating to tickets actually sold in prior

weeks in March and April. In fact, the May 5, 2002 report, which consisted almost entirely of OPR sales for tickets sold in April 2002, was the only report processed in May that contained any coupons for tickets actually sold in May. (Ex. 21; A. Belfon Resp. to PSUF ¶ 85; R. Belfon Resp. to PSUF ¶ 85.) As of May 17, 2002, there was a positive balance of $12,757 in WWT's designated account. (Ex. 14 at May 2002; A. Belfon Resp. to PSUF ¶ 86; R. Belfon Resp. to PSUF ¶ 86.) Likewise, the majority of the tickets reported in June were for OPR sales relating tickets actually sold in prior weeks in April and May. WWT ended June 2002 with a positive balance of $235,542.00 in the designated account. (Ex. 14 at June 2002.) Finally, virtually all of the tickets reported by WWT in July 2002 were for OPR sales relating to tickets actually sold in May and June 2002. (Ex. 23; A. Belfon Resp. to PSUF ¶ 91; R. Belfon Resp. to PSUF ¶ 91.) WWT ended July 2002 with a positive balance of $65,847 in its designated account. (Ex. 14 at July 2002.) The account did not go back into overdraft from May 17, 2002 until WWT filed for chapter 11 protection on August 8, 2002. (Ex. 14 at May-Aug. 2002; A. Belfon Resp. to PSUF ¶ 86; R. Belfon Resp. to PSUF ¶ 86.)

In July 2002, as part of its bond renewal application, WWT submitted to Duffy a balance sheet and income statement for the period ending December 31, 2001. The income statement reflected a loss of $159,338 for 2001. (Filice Dep. 29:9-17; Ex. 18.) WWT also reported a loss of $159,338 on its 2001 corporate income tax return signed by Angela Belfon on August 27, 2002. (A. Belfon Dep. Ex. 130.) These facts caused Duffy to request personal financial statements from the principals of WWT as a condition of renewal. (Filice Dep. 26:16-29:22.) On July 25, 2002, however, Ms. Garcia faxed to Duffy a "revised" 2001 balance sheet and income statement, which, contrary to the previous statement, showed a net operating profit of

over $6,000 and a stockholders equity of over $118,000. (Filice Dep. 29:23-31:5.) The explanation from Ms. Garcia was that the statement was revised "due to typographical errors under statement of receipts." (Filice Dep. 30:9-13; Garcia Dep., Ex. 147.) Because Ms. Garcia was at her other office at the Department of Tourism when she sent the fax, and thus did not have access to WWT's information, that "revised" data had been supplied to her by some other unidentified employee of WWT. (Garcia Dep. 89:1-24.)

Due to the continued late and OPR reporting from April to June 2002, ARC decided to conduct a second compliance audit of WWT. (Erickson Dep. 43:2-44:22, 201:11-204:21; Jones Dep. 72:12-76:3.) ARC auditor Rich Jones called Angela Belfon on July 30, 2002 to let her know the auditors would be coming. (Jones Dep. 105:16-21.) Then, on August 1, 2002, ARC's area bank notified ARC of the receipt of two separate weekly sales reports for the PED July 21, 2002 from WWT with two separate settlement authorization forms in the amounts of $138,282.42 and $193,363.36. (Maduro Dep. 64:2-65:12; Erickson Dep. 70:6-71:6.) Angela Belfon mailed both of these reports on July 21, 2002. (A. Belfon Dep. 121:3-11.) Maduro explained that two reports were used because the July 21 report was so big that it would not otherwise fit in an envelope. (Maduro Dep. 64:20-22.) The size of that report resulted from the fact that it included several hundred out-of-period sales dating back to mid-June. (Id. at 67:4-13.) WWT was trying to catch up with the reporting and go back on a regular week to week basis of reporting. (Id. at 67:17-68:6.) Maduro explained that her "supervisor" had instructed her to hold back sales reports because the money was not there to pay for them and WWT wanted

to keep the cash flow up and the business afloat. (Id. at 68:10-17.)[10] Although flatly denying that

she instructed Ms. Maduro to withhold sales, Mrs. Belfon admitted that she may not have

reported sales to ARC if she had not yet collected payment from the customer. (A. Belfon Dep.

106:2-107:9.) Upon ARC's processing of the combined amounts of the two July 21, 2002

reports, the total owed by WWT was $328,095.53, and included ticket sales dating back to June

14, 2002. (Ex. 24.)

During the second audit of WWT, which went from July 30, 2002 to August 2, 2002,

ARC's auditors identified URS's in the amount of $12,642.99. (Erickson Dep. 100:9-102:22 &

Ex. 29; Erickson Aff. ¶ 17; Jones Dep. Exs. 310, 311) On August 2, 2002, ARC demanded that

WWT immediately remit payment by certified check, pursuant to section VIII.D.1 of the ARA,

and that it immediately return all ticket stock and plates, pursuant to section VIII.D.1 and Section

XV of the ARA. (Erickson Dep. 72:2-73:1; 102:18-22.) Finally, ARC presented WWT with a

written notice of termination for section XV violations, including: (1) failure to include in a

report the auditor's coupon of all ARC traffic documents issued through the close of the sales

period, even though payment was subsequently made upon demand; (2) failure to account for

---

[10] Defendants object to Ms. Maduro's statement since it recounts purported out-of-court statements made by Ms. Maduro's "supervisor." Plaintiff, however, does not rely on the out-of-court statements for the truth of the matter asserted, i.e. that WWT needed to keep its cash flow up, but rather to establish why Ms. Maduro repeatedly held back sales reports on her reports to ARC.

Moreover, Defendants contend that Ms. Maduro later denied having told ARC auditors that there were out-of-period reports because WWT was having cash-flow problems. The Court's review of this testimony does not reveal this to be true. Rather, in a second deposition of May 23, 2008, Ms. Maduro testified that she did not "recall" either telling auditors or previously testifying that WWT purposely withheld sales to keep its head above water. (Maduro Dep. #2, 99:23-100:15, May 23, 2008.) Such testimony is far different than a denial of what she purportedly told the auditors.

missing ARC traffic documents or for flight, exchange, or service coupons thereof; and (3) falsification of reports, traffic documents, or other documents. (Id. at 103:1-104:16 & Ex. 29; Jones Dep. 86:3-89:21 & Exs. 311 & 315.) Auditor Jones could not recall being given any information that Ronald Belfon had any knowledge of the financial dealings of WWT, other than what Angela Belfon told Jones about Mr. Belfon's working for the agency thirty-five hours per week, most of which was outside the agency. (Jones Dep. 111:2-18.) Ronald Belfon attempted to contact the auditors before they left the area, but missed them. (Ex. 25. Dep. of Roberto Rosario-Cruz 39, Aug. 29, 2005 ("Cruz Dep."); Jones Dep. Ex. 318; R. Belfon Dep. 33:14-40:3.) On August 5, 2002, Mr. Belfon sent Mr. Rosario-Cruz an e-mail regarding WWT's efforts to arrange delivery of the traffic documents and plates. (Jones Dep. Ex. 318; R. Belfon Dep. 38:6-39:3.) Ultimately, on August 5, 2002, ARC sent WWT formal written notice and confirmation of automatic termination of the ARA pursuant to XV, effective August 13, 2002, unless WWT surrendered all traffic documents and airline identification plates and exercised its appeal rights by August 12, 2002. (Erickson Aff. ¶ 17; Erickson Dep. 99:2-14, Exs. 29, 216.)

Angela Belfon met with Mr. Olive at BPPR, on Wednesday August 7, 2002, to request overdraft authority for the pending ARC debits. Although Mr. Olive, not knowing of ARC's demand of WWT's ticket stock and plates, originally recommended approval of this request, another supervisor at the bank opted to deny it. (Olive Dep. 120:4-125:11 & Ex. 116; Ex. 26, Dep. of Valentino McBean, 45:11-17, Nov. 5, 2003 ("McBean Dep.").) This latter decision was communicated to Mrs. Belfon on August 8, 2002. (Olive Dep. 125:6-19 & Ex. 116.)

On August 7, 2002, ARC's area bank issued a draft for the total amount due for the PED July 21, 2002 ($328,095.53) and one amount for the PED July 28, 2002 ($103,104.82). Because

there was a balance of at least $148,000 in the designated account, as of August 7, 2002, sufficient funds were available for BPPR to honor the draft for the July 28, 2002 PED, yet both of the drafts were dishonored by BPPR. (Olive Dep. 130:5-25; A. Belfon Dep. Ex. 116.) As explained by Mr. Olive, WWT, through Verne David, had made a stop order request against both ARC debits on August 7, 2002. (Olive Dep. 131:4-133:17; Ex. 27, Dep. of Pablo Irizarry, 11-16 & Ex. 1, Dec. 10, 2007 ("Irizarry Dep.").) The telephone call was made in the presence of Angela Belfon. (A. Belfon Dep. 157:15-159:25.) Although Mr. David testified that Mrs. Belfon told him the stop order was "on advice of counsel," (David Dep. 86), Mrs. Belfon testified that she did not know which attorney gave that advice. (A. Belfon Dep. 159:15-25.) Several months later, on January 14, 2003, Ronald Belfon e-mailed the bond company, USF&G, to emphasize that "the drafts by ARC on WWT's account was not dishonored for insufficient funds; in fact the electronic funds transfer (EFT) was revoked by WWT prior to the draft by ARC. This is the equivalent of a stop payment and not a bounced check." (R. Belfon Dep. 75:1-76:1.)[11]

### E.   WWT's Bankruptcy

On August 8, 2002, WWT filed a voluntary petition for bankruptcy under Chapter 11 of Title 11 of the United States Code. (A. Belfon's Resp. to PSUF ¶ 120; R. Belfon's Resp. to PSUF ¶ 120.) That decision was reached via joint discussion between Angela and Ronald Belfon. (R. Belfon Dep. 42:6-42:3.) Although, Mr. Belfon admitted to originally contacting

---

[11] Defendants contend that the Court should not consider this e-mail because failed to include it as part of its exhibits. The Court recognizes that Plaintiff, on multiple occasions, references either exhibits or deposition pages that it has not provided. While the Court has disregarded factual allegations as a result of these failures, the particular factual allegation at issue is also supported by Ronald Belfon's own deposition testimony verifying the content and authenticity of the e-mail.

Benjamin Currence, Esq., WWT's Chapter 11 counsel, Mrs. Belfon testified that she never

discussed any of her meetings with Mr. Currence regarding the WWT bankruptcy with Mr.

Belfon.[12] (R. Belfon Dep. 45:1-22; A. Belfon Dep. 167:14-169:3.) Further, Felicia Maduro

averred that, prior to preparing for the hearing with the bankruptcy trustee in November 2002,

she and Ronald Belfon never discussed the financial aspects or conditions of WWT. (Maduro

Aff. ¶ 7; Garcia Aff. ¶ 9; R. Belfon Dep. 54:17-58:8.)

WWT continued to operate under the control of the Defendants as a Debtor in Possession

until the WWT Chapter 11 case was converted to Chapter 7 on October 24, 2002, and a Chapter

7 trustee was appointed. (A. Belfon Resp. to PSUF ¶ 120; R. Belfon Resp. to PSUF ¶ 120.)

After the conversion to Chapter 7, the Chapter 7 trustee conducted a Section 341 meeting of

creditors on November 14, 2002. Angela and Ronald Belfon, along with Felicia Maduro,

attended the meeting to answer questions, and Mr. Belfon responded to many of the substantive

questions about WWT's activity and financial status, but denied that he had any involvement in

assisting with WWT's business. (Ex. 29.) On February 12, 2003, ARC filed an amended proof

of claim in the amount of $606,410.10 for the total due for August 7, 2002 dishonored drafts, the

PED August 4 and August 11, 2002, the debit memos that ARC received from various carriers,

and all applicable compensatory and late fees, less all receipts and credits. (Ex. 30.) The validity

and amount of the debt owed by WWT to ARC, as set forth in that Amended Proof of Claim,

was fully and finally adjudicated by the bankruptcy court. (Order, Bankr. Case. No. 02-00027,

Nov. 26, 2006.) Notably, neither Angela Belfon nor Ronald Belfon were parties to the

---

[12] Mr. Currence testified that he had no knowledge of and no involvement in the efforts to stop order ARC's debits. (Ex. 28, Dep. of Benjamin Currence 35:9-41:23, Aug. 22, 2005 ("Currence Dep.").)

bankruptcy proceedings and the court ruled that they could contest their liability for WWT's debt. (Id.) ARC has, to date, been fully reimbursed all the fees it was owed, meaning that any loss has been borne by the airline carriers. (Erickson Dep. 92:12-94:17.)

## III. PROCEDURAL HISTORY

Plaintiff filed the present case on August 29, 2003 against Defendants Angela Belfon, Ronald Belfon, and Verne David. The Complaint contains six counts as follows: Count I - breach of fiduciary duty; Count II - conversion; Count III - fraud; Count IV - common law conspiracy; Count V - breach of corporate fiduciary duty; and Count VI - tortious interference with contract. In early 2010, after years of litigation, the parties commenced a barrage of dispositive motions, including Defendant Ronald Belfon's Motion to Dismiss for lack of subject matter jurisdiction, Plaintiff's Motion for Summary Judgment as to Counts I, II, and III of the Complaint, and Ronald Belfon's Motion for Summary Judgment as to the entirety of the case against him. The Court addresses each motion individually.

## IV. RONALD BELFON'S MOTION TO DISMISS

### A. Standard of Review on a Motion to Dismiss

Federal courts only have authority to adjudicate cases over which they have subject-matter jurisdiction. Brown v. Francis, 75 F.3d 860, 866 (3d Cir. 1996). Indeed, even after a court has proceeded completely through a case to a final judgment, if the court lacked subject-matter jurisdiction, the judgment must be vacated. Caterpillar Inc. v. Lewis, 519 U.S. 61, 76-77 (1996) ("[I]f, at the end of the day and case, a *jurisdictional* defect remains uncured, the judgment must be vacated."). A court without subject-matter jurisdiction has no choice but to decline to entertain the suit. Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986).

27

When a motion to dismiss is made under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and attacks the complaint as deficient on its face, the Court must take all allegations in the complaint as true. <u>Mortensen v. First Fed. Sav. and Loan Ass'n</u>, 549 F.2d 884, 891 (3d Cir. 1977). When, however, the motion attacks the existence of subject matter jurisdiction in fact, no presumptive truthfulness attaches to plaintiff's allegations and the Court may weigh the evidence to satisfy itself that subject matter jurisdiction exists in fact. <u>Id.</u>; <u>see also</u> <u>Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.</u>, 227 F.3d 62, 69 (3rd Cir. 2000); <u>Richardson v. Dept. of Human Serv.</u>, No. CIV.A.05-226, 2006 WL 2060451, at *2 (W.D. Pa. Jul. 21, 2006).

**B.    Discussion**

Defendant Ronald Belfon moves to dismiss the entirety of the Complaint on two grounds: (1) lack of standing and (2) failure to establish diversity jurisdiction.[13] Given the differing nature of these two arguments, the Court entertains them via separate discussions.

**1.    Whether ARC Has Standing to Pursue this Claim**

Defendant argues that ARC has admitted to being fully reimbursed all of the fees to which it was entitled by the airlines and has no evidence of any assignment by the airlines of its claims to ARC. Accordingly, ARC has suffered no concrete injury and, in turn, has no authority

---

[13] The Court notes that, prior to this case being transferred to the docket of the undersigned, Defendant Belfon previously raised these issues by way of a Motion for Summary Judgment dated January 9, 2006. Although ARC submitted a Response and Defendant Belfon filed a Reply Brief, no ruling was ever issued on that motion. On May 31, 2007, this entire matter was transferred to the undersigned, but the parties never alerted the Court to the outstanding motion. Defendant Ronald Belfon then renewed his arguments by way of the present motion to dismiss. Given this unusual procedural background, the Court does not deem the present motion to be untimely.

to sue the individual Defendants on behalf of the airlines.[14]

Article III of the Constitution requires the existence of an active case or controversy before a matter may be presented to a federal court. U.S. CONST. art. III § 2; Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); Presbytery of N.J. of Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1462 (3d Cir. 1994); see also; Danvers Motor Co., Inc. v. Ford Motor Co., 432 F.3d 286, 290-91 (3d Cir. 2005) ("By ensuring that litigants present actual cases and controversies, [Article III] keeps the judicial branch from encroaching on legislative prerogatives, thereby preserving the separation of powers."). Standing and ripeness are components of the case or controversy requirement. Presbytery of N.J., 40 F.3d at 1462. "[R]ipeness tells us when a proper party may bring an action and . . . standing tells us who may bring the action." Id.

For purposes of the present Motion to Dismiss, the Court is concerned solely with standing. The concept of standing is drawn directly from Article III, Section 2 of the Constitution. Allen v. Wright, 468 U.S. 737, 750-51 (1984). Article III standing goes to the very heart of a court's subject matter jurisdiction. Id. It determines whether the court has jurisdiction to resolve a dispute on the merits. Warth v. Seldin, 422 U.S. 490, 498 (1975); ACLU-NJ v. Township of Wall, 246 F.3d 258, 261 (3d Cir. 2001). "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed." Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 188 (3d Cir. 2006); ACLU-NJ v. Twp. of Wall, 246 F.3d 258, 261 (3d Cir. 2001). As such, standing is a threshold issue that

---

[14] The parties' arguments on this issue suffer from a dearth of cited authority, analysis, and explanation. Indeed, Plaintiff repeatedly confuses the issues of standing with the issues of real party in interest and lack of diversity jurisdiction, making its responsive brief convoluted and completely unhelpful to the Court. Defendants' briefs fare no better. Without the benefit of counsel's thorough research, the Court now attempts to sort through these issues.

needs to be addressed before any consideration of the merits. <u>Steel Co. v. Citizens for a Better Env't.</u>, 523 U.S. 83, 94-102 (1998). Moreover, "[c]onstitutional standing is jurisdictional and cannot be waived by a party to suit." <u>Medtronic Sofamor Danek USA, Inc. v. Globus Med., Inc.</u>, 637 F. Supp. 2d 290, 298 (E.D. Pa. 2009) (citing <u>United States v. Hays</u>, 515 U.S. 737, 742 (1995)).

To establish standing, a plaintiff must demonstrate: (1) an injury-in-fact; (2) a causal connection between the injury and the defendant's conduct; and (3) that it is likely, rather than speculative, that a favorable judicial determination will redress the injury. <u>Khodara Env't, Inc. v. Blakely</u>, 376 F.3d 187, 193 (3d Cir. 2004); <u>Danvers</u>, 432 F.3d at 290-91; <u>Taliaferro</u>, 458 F.3d at 188. An injury-in-fact is a harm that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180-81 (2000); <u>see also Danvers</u>, 432 F.3d at 291. A "causal connection" means that the injury is "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." <u>Lujan</u>, 504 U.S. at 560 (quotations omitted). The Supreme Court has found that standing is present when "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." <u>Assoc. Data Processing Serv. Org. v. Camp.</u>, 397 U.S. 150, 153 (1970). Accordingly, to survive a motion to dismiss based on standing, a plaintiff must plead that he or she suffered some concrete form of harm because of the defendant's actions. <u>Danvers</u>, 432 F.3d at 292.

In the present matter, the facts are undisputed that ARC itself has been repaid all of the money to which it was entitled and that only the airline carriers that it represents bear any loss.

Deborah Erickson, ARC's designated corporate representative, specifically testified:

Q.  If a travel agent goes bankrupt and has not paid for tickets on various airlines, does ARC have to pay the airlines, or does the airlines just lose the money?

A.  I'm going to answer that: Both. When the weekly report comes in -- In this particular case --

Q.  Mm-hmm.

A.  -- because it's a returned draft, on Wednesday, when we are drafting the agent's bank account for the report, ARC is disbursing the moneys to the carrier in anticipation that the trust funds that the agent had will allow that bank draft to clear. So on that trust basis, on Wednesday, we're receiving moneys from the agent and we are sending moneys to the carrier. When a check is dishonored by the agent's bank, the funds have already been given to the carriers.

   If the agent fails to give us replacement funds or declares bankruptcy, then ARC has to reverse that and go back to the airlines and say, We want ARC's money back because we didn't get it from the travel agent, for whatever reason.

Q.  And does ARC get the money back?

A.  Yes.

Q.  So --

A.  From the airline, yes.

Q.  So in this case, whatever the amount that was not paid because the two debits were dishonored, the airlines paid that back to ARC?

A.  Yes, after a period of time.

Q.  And then does ARC -- the airline just take that loss?

. . .

A.  If they don't get paid for the tickets, they get a loss.

(Erickson Dep. 92:22-94:17.)

Despite this lack of actual damages, however, ARC appears to satisfy the standing

requirements for the present case. Although parties cite and the Court can find no Virgin Islands

law addressing this issue, it is well settled among multiple states that "[w]hen a firm has reached

the point of insolvency, . . . the firm's directors . . . owe fiduciary duties to the company's creditors. In re Scott Acquisition corp., 344 B.R. 283, 289-90 (Bankr. D. Del. 2006) (quoting Prod. Res. Group L.L.C. v. NCT Group, Inc., 863 A.2d 772, 790-92 (Del. Ch. 2004). As such, judgment-lien creditors maintain the power and right to bring an action for breach of fiduciary duty, either directly or derivatively, against the corporations officers, directors, and attorneys. See, e.g., In re Bostic Constr., Inc., ___ B.R. ___, 2010 WL 2598253, at *12 (Bankr. M.D.N.C. 2010) ("[a]lthough the general rule is that directors of North Carolina corporations do not owe a fiduciary duty to the creditors of the corporation, an exception exists when there are circumstances amounting to a winding up or dissolution of the corporation); In re Felt Mfg. Co., Inc., 371 B.R. 589, 611 (Bankr. D.N.H. 2007) (holding that, under New Hampshire law, once a corporation is insolvent, its directors owe a fiduciary duty to the corporation's creditors and creditors have standing to maintain derivative claims for breaches of fiduciary duty); In re I.G. Serv., Ltd., Adv. No. 04-5041, 2007 WL 2229650, at *3 (Bankr. W.D. Tex. Jul. 31, 2007) (holding that "as a matter of *standing*, creditors had the right to bring [derivative] actions for breach of fiduciary duties, and thus, by extension, actions for knowing participation in breach of fiduciary duties, at least when the corporation has entered the zone of insolvency."); N. Am. Catholic Educ. Programming Found, Inc. v. Gheewalla, 930 A.2d 92, 101-02 (Del. 2007) (holding that, under Delaware law, "the creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duty); Alexander v. Anstine, 152, P.3d 497, 501-03 (Colo. 2007) (allowing for a direct action by judgment creditor of insolvent corporation against directors for fraudulent or preferential transfers under Colorado law).

In this matter, the bankruptcy court expressly deemed ARC to be the principal creditor of WWT's bankruptcy estate based on the fact that WWT owed debts under the ARA contract. The amount and validity of the debt owed by WWT to ARC was fully and finally adjudicated. In turn, ARC now holds a court-ordered judgment lien against WWT and has, thus, been judicially recognized as an injured party due to WWT's breach of the ARA.

ARC now brings a derivative tort suit to impose individual liability on WWT's officers and directors to collect on this unsatisfied judgment. The only damages sought are for the unpaid balance of ARC's judgment against WWT that were unsatisfied from the surety bond and the assets of the WWT bankruptcy estate. While this action is not, as ARC would have the Court believe, merely a collection action, ARC, as a judgment-creditor, necessarily has standing to pursue a derivative action for breach of fiduciary duty against the officers and directors – *i.e.* the Defendants – of WWT. See generally Airlines Reporting Corp. v. Ellison, 296 F.3d 266 (4th Cir. 2002) (implicitly acknowledging that ARC had standing to pursue a tort action against the bankrupt travel agent's officers and directors). Given the fact that ARC had standing to pursue a judgment in bankruptcy, the Court must necessarily find, under the above-referenced jurisprudence, that it has standing to pursue a derivative claim for damages against WWT's officers and directors.[15]

---

[15] Plaintiff cites Vandergrift Forwarding Co. v. Hartford Fire Ins. Co., No. CIV.A.06-5440, 2009 WL 928337 (E.D.NY. Mar. 31, 2009) to bolster its opposing argument. In that case, the plaintiff was a freight forwarder and customs broker that acted on behalf of shippers to facilitate the successful importation of commercial goods into the United States. Id. at *3. The plaintiff obtained customs bonds from defendant Hartford Fire Insurance Company on behalf of twenty-six shippers. Id. Following a change in customs law that rendered the bonds ineffective, plaintiff brought an action in federal court seeking repayment of premiums and a declaratory judgment regarding premiums not yet paid. Id. The defendants moved to dismiss on the grounds

## 2.   Whether ARC is a Real and Substantial Party to the Controversy for Purposes of Subject Matter Jurisdiction

Defendant Ronald Belfon next argues that the individual airline carriers, and not ARC, are the real and substantial parties to the controversy.[16] Accordingly, for purposes of invoking this Court's diversity jurisdiction, Defendant contends that Plaintiff had to allege and prove that all of the individual airline carriers satisfied the requirements for federal diversity jurisdiction. Having failed to do so, Defendant Belfon now contends that the case must be dismissed.

While both parties in this case tangentially mention the "real party in interest" standard of

---

that plaintiff could not establish diversity jurisdiction, lacked Article III standing, and was not a real party in interest under Federal Rule of Civil Procedure 17(a). Id. The court found that the plaintiff had not alleged a concrete injury since the shippers, not the plaintiff, were the parties harmed by the defendants' failure to return the premium payments. Id. It went on to note that plaintiff had not been assigned any interest in the claim for the return of payments and plaintiff conceded that it was bound to transmit any repayment to the shippers. Id. Finally, the court dismissed plaintiff's allegations of harm to its business relationships as "highly speculative" and not "'concrete and particularized.'" Id.

Although Plaintiff cites Vandegrift for the proposition that ARC, as a mere collection agency for the airline carriers, has not suffered any injury and thus does not have standing, this case is inapposite. Unlike the plaintiff in Vandegrift, ARC specifically contracted with WWT under the ARA. Subsequently, WWT went bankrupt and ARC, in its own right as a party in contractual privity with WWT, obtained a judgment order against the bankrupt estate. As noted above, pursuant to jurisprudence prevailing in a majority of jurisdictions, a judgment creditor of an insolvent corporation has standing to pursue derivative claims for breach of fiduciary duty against the corporation's officers and directors.

[16] While the parties appear to combine the analyses, it is important to note that the question of whether a party is a "real party in interest" is a different inquiry than whether that party has standing, as a party may meet one requirement but not the other. Standing is a jurisdictional limitation and has to do with whether the plaintiff has alleged that she suffered an injury caused by the defendant that is redressable by the Court. See Lujan, 504 U.S. at 560-61. The concept of a real party in interest for the purpose of testing a court's diversity jurisdiction, on the other hand, involves a determination about whether a named party "has a 'real interest' in the suit or, in other words, is a 'real party' to the controversy." Carden v. Arkoma Assocs., 494 U.S. 185, 200 (1990).

Rule 17(a) of the Federal Rules of Civil Procedure, it is apparent from the briefs that the actual dispute between the parties turns on the related question of whether Plaintiff is a real party to the controversy for purposes of diversity jurisdiction. The United States Supreme Court has recognized that while "[t]here is a 'rough symmetry' between the 'real party in interest' standard of Rule 17(a) and the rule that diversity jurisdiction depends upon the citizenship of real parties to the controversy[,] . . . the two rules serve different purposes and need not produce identical outcomes in all cases." Navarro Sav. Ass'n v. Lee, 446 U.S. 458, 463 n.9 (1980); see also Oscar Gross & Son, Inc. v. Hollander, 337 F.3d 186, 194 (2d Cir. 2003). As a matter of federal law, a plaintiff must ground diversity upon "citizens" who are real and substantial parties to the controversy. Id. at 461. This hurdle prevents a party with an insufficient interest in the litigation from using his or her citizenship to transfer a local controversy into one within federal diversity jurisdiction, and vice-versa. Wilsey v. Eddingfield, 780 F.2d 614, 615-16 (7th Cir. 1985), cert. denied, 475 U.S. 1130 (1986). "[A]lthough one serving in a representative capacity may thus be a real party in interest in the sense that the action is properly maintained in his name . . . a representative is not necessarily the real party in interest for the purpose of determining diversity jurisdiction."[17] Id. at 615.

---

[17] To the extent Defendant Ronald Belfon intended to rely on a Federal Rule of Civil Procedure 17 argument, his analysis is confused and disjointed, and fails to properly recite or apply the law. Based on both the arguments and the relief sought, the Court assumes that Rule 17 is not truly the basis for his Motion to Dismiss, but rather lack of subject matter jurisdiction due to ARC not being a real and substantial party to the controversy.

Nonetheless, even we considered Rule 17, we would find ARC to be a real party in interest. It is telling that the two cases on which Defendant places his utmost reliance – Airlines Reporting Corp v. S&N Travel, Inc., 58 F.3d 857 (2d Cir. 1995) and Airlines Reporting Corp. v. Abed, No. CIV.A.95-2220, 1996 WL 19568, at *1 (N.D. Ill. Jan. 18, 1996) – both found ARC to be the real party in interest for purposes of Rule 17, but declined to deem it a real and substantial party to the controversy for purposes of diversity jurisdiction. In addition, the two state court

"To establish whether a plaintiff is a 'real and substantial party to the controversy,' a crucial distinction must be made between a plaintiff who sues solely in his capacity as an agent, on the one hand, and, on the other, a plaintiff who sues not only as an agent, but also as an individual who has his own stake in the litigation." Oscar Gruss & Son, 227 F.3d at 194. Where a party is not a "'mere conduit' but possesses a valid stake in the litigation sufficient to be considered a 'real and substantial' party for diversity purposes" the citizenship of that party is determinative for purposes of establishing diversity jurisdiction. Id. Where, however, a corporation acts only as a representative for a group of individuals and has no interest itself in the outcome of the litigation, the citizenship of the of the represented parties controls for diversity purposes. N. Trust Co. v. Bunge Corp., 899 F.2d 591, 594-95 (7th Cir. 1990).

ARC argues that it is a real party to the controversy because the ARA was a contract executed by ARC and WWT for the benefit of the airline carriers. It thus contends that ARC has the authority to pursue this tort action against the Defendants. It further cites to the bankruptcy court's finding that WWT breached its contract with ARC, thereby making ARC entitled, in its own right, to a judgment of $606,410.10 from the WWT bankruptcy estate.

ARC's argument, however, misunderstands the applicable law. The Restatement Second of Agency states, "[a] person with whom an agent makes a contract on behalf of a principal is subject to liability in an action brought thereon by the agent in his own name on behalf of the

---

cases cited by Plaintiff – Airlines Reporting Corp. v. S&N Travel, 656 N.Y.S.2d 299 (N.Y. App. Div. 1997) and Airlines Reporting Corp. v. Pro Travel, 657 N.Y.S.2d 654 (N.Y. App. Div. 1997) -- expressly found ARC, under circumstances almost identical to the present matter, to be a real party in interest under Rule 17. Relying on the reasoning of all these cases, the Court would reach the same conclusion.

principal if the agent is a party promisee."[18] RESTATEMENT (SECOND) OF AGENCY § 364 (1958).

However, "[a]n agent does not have such an interest in a contract as to entitle him to maintain an

action at law upon it in his own name merely because he is entitled to a portion of the proceeds

as compensation for making it or because he is liable for its breach." RESTATEMENT (SECOND)

OF AGENCY § 372 (1958). In other words, an agent cannot maintain an action on a contract in his

own name on behalf of his principal unless he is a party to the contract, a transferee, or a holder

of an interest in the contract. Colonial Secs., Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,

461 F. Supp. 1159, 1165 (S.D.N.Y. 1978). (citing RESTATEMENT (SECOND) OF AGENCY §§ 363,

372 (1958)).

Where the suit does not sound in contract, but rather in tort, the rules are somewhat

different. "A servant or other agent has no action of tort because another has tortiously harmed

the principal or destroyed his business, unless the other acted for the purpose of harming the

agent's interests." RESTATEMENT (SECOND) OF AGENCY § 374 (1958). Thus, a contract that

permits a party to sue on behalf of another party to enforce the terms of the contract does not

automatically permit that party to bring tort suits related to the making or performance of the

contract. See generally Rock Drilling, Blasting, Roads, Sewers, Viaducts, Bridges, Foundations,

Excavations & Concrete Work on All Constr., Hod Carriers', Bldg. & Common Laborers' Local

Union No. 17 v. Mason & Hanger Co., 217 F.2d 687, 693-94 (2d Cir. 1954).

Two cases remarkably similar to the one at bar offer significant guidance to the Court.

---

[18] With the enactment of the Virgin Islands Code in 1957, the Virgin Islands Legislature adopted
the American Law Institute's restatements of the law as the substantive law of the Virgin Islands
until and unless the Legislature enacts local laws to the contrary. Bell v. Chase Manhattan Bank,
40 F. Supp. 2d 307, 309 (D.V.I. 1999) (citing 1 V.I.C. § 4).

First, in <u>Airlines Reporting Corp. v. S & N Travel, Inc.</u>, plaintiff Airlines Reporting Corporation

brought a diversity action in its capacity as representative of numerous air carriers, seeking to

collect from a New York travel agency and its directors approximately $375,000 owed to those

carriers for the purchase of airline tickets. 58 F.3d 857, 859 (2d Cir. 1995). The complaint

alleged claims of breach of contract under an earlier version of the ARA, breach of fiduciary

duty, conversion, fraud, and negligence under New York common law. <u>Id.</u> The defendants

moved to dismiss the complaint asserting that the district court lacked subject matter jurisdiction

since ARC was acting solely as a collection agent for the individual air carriers and, therefore,

the citizenship of the individual air carriers, rather than that of ARC, controlled for purposes of

diversity jurisdiction. <u>Id.</u> at 860. The district court agreed that ARC was not the real party in

interest and that because the individual air carriers were not diverse, the action should be

dismissed. <u>Id.</u> at 860-61. On appeal, the Second Circuit concurred, finding that although ARC

was a "real party in interest for purposes of Rule 17" and could bring the suit in its own name, it

was not real and substantial party to the controversy for purposes of determining diversity of

citizenship. <u>Id.</u> at 861 & n.4. It noted that, "[i]n initiating this lawsuit ARC did not seek to

protect any corporate interests of its own. Rather, ARC simply sought to fulfill its obligations

under the CSA as both collection agent and attorney for those twenty-nine air carriers owed

money by S & N." <u>Id.</u> at 862. The appellate court went on to explain that:

> ARC does not suggest that it suffered any corporate damage or pecuniary loss
> itself from S & N's failure to pay for the issued airline tickets. Nor does ARC lay
> claim to any portion of the potential recovery obtained in the lawsuit, as it
> concedes that section XII of the CSA, which describes ARC's collection process,
> obligates ARC to remit any damages it collects in this action to the twenty-nine
> claim-holding air carriers. Thus, ARC is a mere conduit for a remedy owing to
> others, advancing no specific interests of its own. . . . If the air carriers, as

opposed to ARC, were the ones injured by the defendants' conduct, "they cannot by enlisting their association as their champion break out of the limits of the diversity jurisdiction."

Id. (internal citations and quotations omitted).

Similarly, in Airlines Report Corp. v. Abed, plaintiff ARC had entered into an Agency Reporting Agreement with the defendant travel agency. No. CIV.A.95-2220, 1996 WL 19568, at *1 (N.D. Ill. Jan. 18, 1996). Eventually, the travel agency was placed in default for, among other things, permitting ARC drafts to be dishonored, failing to make sales reports, and failing to report as sales certain issued tickets. Id. Plaintiff brought suit against defendant, under diversity jurisdiction, to collect the relevant sums. Id. In response, the defendant claimed that the citizenship of the individual airlines should be used for diversity purposes since ARC was not a real and substantial party to the controversy. Id. at *2. Relying on S&N Travel, the court found that:

> Plaintiff's complaint states that "[o]n behalf of the Carriers, ARC is authorized to demand payment and to collect from the agents the Carrier's portion of the revenues received by the agents. . . . ." Plaintiff's complaint admits that the collection of damages is made on behalf of the air carriers. Therefore, as in S&N Travel, ARC is not advancing its own interests or seeking is own damages but merely serving as a collection agency to obtain a remedy for the air carriers.

Id. at *2 (footnote omitted). Ultimately, the court found that because the plaintiff had neither identified the air carriers involved in this case nor alleged their citizenship, the complaint failed to establish subject matter jurisdiction and should be dismissed in its entirety. Id. at *3.

This case presents an almost identical situation. As set forth in detail above, ARC, as through its representative Deborah Erickson, has conceded that it has been reimbursed all sums

39

to which it was entitled and any recovery it obtains in this case will be passed through directly to the airlines. Section VIII.A.9 of the ARA specifically states that, "[a]ll monies and credit card billing documents, less applicable commission, collected by [WWT] for sales hereunder *are property of the carriers*, and shall be held in trust by the Agent until satisfactorily accounted for to the carriers." (ARA § VIII.A.9 (emphasis added).) ARC will be entitled to no benefits of the action if successful and has merely a nominal interest in pursuing this action. Accordingly, like both <u>S&N Travel</u> and <u>Abed</u>, ARC is now acting as a "mere conduit for a remedy owing to others, advancing no specific interests of its own."

Given this fact, Plaintiff must establish some other basis on which to assert that it is a real and substantial party to the controversy. For this purpose, Plaintiff relies on the ARA, which expressly states that:

> ARC shall be considered a real party in interest in any cause of action, suit, or arbitration (hereinafter collectively "action") to enforce the terms of this agreement including any action brought by ARC, after the termination of this agreement by ARC or the Agent, to collect amounts due the carriers by the Agent.

(ARA XXIX.G.) To paraphrase, this provision is an express assignment from the carriers to ARC to bring a *contract* action against the *Agent, i.e.* WWT. Nothing in this provision, however, grants any authority to ARC to pursue any claim against non-signatories to the contract such as the three individual Defendants here.[19] Moreover, nothing in this provision permits ARC to

---

[19] It is well-established that the terms of a contract signed between two corporations has no binding effect on the individual officers of the corporation who signed in their official, not individual capacities. <u>See</u> <u>MoneyGram Payment Sys, Inc. v. Consorcio Oriental, S.A.</u>, 65 Fed. Appx. 844, 84849 (3d Cir. 2003) (disregarding a contract's forum selection clause where suit was against individual officers of corporation and individuals had signed contract as officers of the corporate entity, not as individuals).

recover, on behalf of the carriers, damages in a tort action for fraud, conversion, conspiracy, tortious interference with contract, and breach of fiduciary duty. Indeed, by negative implication, it is reasonable to interpret Section XXIX.G as an express limitation of ARC's representative authority to bring suits for the carriers.[20]

Moreover, as emphasized above, this action is not merely a collection action to enforce the judgment entered by the bankruptcy court. The order of bankruptcy court was specifically against WWT and found that WWT had breached its contractual obligations to ARC. That judgment fixed the amount of the debt owed by WWT to ARC. None of the individual Defendants were parties to the bankruptcy proceedings. Indeed, the court expressly approved of the settlement agreement, which stated that "[n]othing contained herein shall impair or effect any rights, claims or causes of action of ARC or the Trustee against third parties not specifically identified herein, including but not limited to, claims, rights and causes of action against Angela Belfon, Ronald Belfon, Verne David, or any other former officer or director of WWT." (Ex. 6.) ARC's standing to pursue such claims does not translate into it being a real and substantial party to the controversy.[21]

Finally, Plaintiff points to nothing that could qualify as an express assignment of the

---

[20] Plaintiff argues that the existence of this provision distinguishes this case from both S&N Travel and Abed since neither of those cases involved the newer version of the ARA and, thus, did not contain section XXIX.G. As noted above, however, the addition of this provision may have actually limited the scenarios in which ARC could be deemed a real and substantial party to cases involving breach of contract.

[21] Plaintiff also contends that, unlike in this case, ARC's claims against the defendants in S & N Travel and Abed had not been reduced to a judgment. Plaintiff, however, again fails to recognize that the bankruptcy judgment in this matter is only against WWT and, by express order of the Court, has no bearing on Defendants' liability for WWT's debts.

airline carriers' tort claims to ARC. Indeed, in the affidavit attached to Plaintiff's Response to

Defendant Ronald Belfon's Motion to Dismiss, Eric Schlam, assistant general counsel for ARC,

avers only that "ARC has full authority to resolve this action" while avoiding the more important

representation that there has been an express authorization by the carriers.[22] (Pl.'s Resp. Mot. to

Dismiss, Ex. 50, Aff. of Eric Schlam ¶ 14, May 27, 2010 ("Schlam Aff.").)

In short, ARC is not the real and substantial party in interest in this case for purposes of

determining diversity jurisdiction. As it concedes, it has no corporate or pecuniary interest in this

case, but rather seeks to represent the airline carriers to whom WWT owes money. It does not

claim any damages or allege that it will benefit from any recovery in this case. Indeed, it admits

that it will pass on any recovery to the injured airline carriers, as it is required to do under the

ARA. Accordingly, "ARC is not advancing its own interests or seeking its own damages but

merely serving as a collection agency to obtain a remedy for the air carriers." Abed, 1996 WL

19568, at *3. Given these circumstances, the air carriers cannot end-run the requirements of

diversity jurisdiction by having ARC bring the suit on their behalf.[23] Id.

---

[22] In an alternative argument, Plaintiff contends that the bankruptcy court explicitly recognized
that the ARA created a trust relationship between WWT and ARC, wherein the trustee was
WWT, the trust *res* was the proceeds of sales on ARC ticket stock, and the beneficiaries were
ARC and the participating carriers. (PSUF Exs. 5-6.) Therefore, Plaintiff contends that ARC is
the real party in interest. As set forth above, however, this suit involves tort claims against the
officers and directors of WWT and is not a suit involving the trust *res*. Only the carriers have
entitlement to damages collected in this suit.

[23] Plaintiff cites to two state court decisions from New York's intermediate appellate level. First,
it references Airlines Reporting Corp. v. S&N Travel, 656 N.Y.S.2d 299 (N.Y. App. Div. 1997),
which was a case filed in state court after the dismissal by the Second Circuit in the above case
with the same name. The defendants moved for dismissal based on the argument that ARC was
not the real party in interest. Id. at 299. The New York Appellate Division determined that ARC
was the real party in interest under New York's Civil Practice laws because "the customs and
dealings of the parties indicate[d] that ARC was acknowledged by the defendants as the carriers'

42

### 3.     <u>Whether the Court Has Subject-Matter Jurisdiction Over This Case</u>

Having reached the foregoing conclusion, the Court must now determine whether federal

subject matter jurisdiction exists over this case. As noted above, this litigation is based entirely

on diversity jurisdiction since there is no federal question involved. For a case to fall within the

diversity statute, 28 U.S.C. § 1332, there must be complete diversity among the parties in that no

plaintiff and no defendant may be citizens of the same state. <u>Carden v. Arkoma Assoc.</u>, 494 U.S.

185, 187 (1990). In addition, the requisite amount in controversy must exceed $75,000,

exclusive of costs and interest. 28 U.S.C. § 1332(a). Generally, there is a presumption against

the existence of federal jurisdiction. 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, &

EDWARD H. COOPER, FED. PRAC. & PROC. § 3522 (3d ed.). "A party who invokes the

jurisdiction of the federal courts has the burden of demonstrating the court's jurisdiction."

<u>Columbia Gas Transmission Corp. v. Tarbuck</u>, 62 F.3d 538, 541 (3d Cir. 1995); <u>Correctional</u>

<u>Med. Care, Inc. v. Gray</u>, No. CIV.A.07-2840, 2008 WL 248977, at *3 (E.D. Pa. Jan. 30, 2008).

Although the three individual Defendants are citizens of the Virgin Islands and ARC is

incorporated in Delaware, the crucial citizenships are those of the "real and substantial parties to

---

general agent." <u>Id.</u> Second, ARC cites <u>Airlines Reporting Corp. v. Pro Travel</u>, 657 N.Y.S.2d
654 (N.Y. App. Div. 1997), wherein the court found, again under New York state law, that "[a]
contracting party generally has a right to maintain an action in its own name," and that ARC's
agreement with the airline carriers permitted it to independently bring suit on behalf of those
carriers. <u>Id.</u> at 654.

    By citing these cases, however, Plaintiff again confuses the analysis for a "real party in
interest" under Rule 17 and a real and substantial party for purposes of determining diversity
jurisdiction. These cases considered only what constituted a real party in interest under Federal
Rule of Civil Procedure 17 and New York law. Being that the cases were already at the state
level, the courts had no occasion to discuss whether the requirements of federal diversity
jurisdiction were satisfied.

the controversy." Navarro, 446 U.S. at 460-61. Having determined that the relevant citizenships for diversity purposes in this case are those of the individual air carriers owed money by WWT, the Court must turn to the state of incorporation and principal place of business for each carrier to determine if the requirements of the diversity statute have been met. See 28 U.S.C. § 1332(c) (noting that a corporation shall be deemed to be a citizen of both its state of incorporation and state where it has its principal place of business). In this case, Plaintiff provides an Affidavit and accompanying list of the airline carriers that have claims for proceeds due from WWT, which shows the name of the airline, the airline's principal place of business, and the amount in controversy for that airline. Notably, and somewhat unusually, ARC fails to establish the place of incorporation for each airline, a matter of which the Court will take judicial notice from public record. See FED. R. EVID. 201(b) (stating that a court may take judicial notice of a fact "capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned."); McGehean v. AF & L Ins. Co., No. CIV.A.09-1792, 2009 WL 3172763, at *2 (E.D. Pa. Oct. 2, 2009) (holding that, on a motion to dismiss, courts may take judicial notice of documents which are matters of public record). Combining these sources of proof yields the following list of interested carriers:

| Name of Airline | Place of Incorporation | Principal Place of Business | Amount Allegedly Owed by WWT |
|---|---|---|---|
| America Airlines, Inc. | Delaware | Fort Worth, Texas | $397,968.85 |
| Continental Airlines | Delaware | Houston, Texas | $5,000.66 |

| Delta Air Lines, Inc. | Delaware | Atlanta, Georgia | $66,708.12 |
|---|---|---|---|
| Alaska Airlines, Inc. | Alaska | Seattle, WA | $1,762.16 |
| U.S. Airways | Delaware | Tempe, AZ | $26,436.28 |
| Iberia Airlines of Spain | Spain | Madrid, Spain | $2,115.65 |
| Philippine Airlines | Philippines | San Francisco, CA | $5,500.97 |
| South African Airways | South Africa | Kempton Park, Ekurhuleni, Gauteng | $141.00 |
| Caribbean Airlines | The Republic of Trinidad and Tobago | Piarco, Trinidad | $1,728.37 |
| British Airways | England and Wales | Jackson Heights, NY | $16.30 |
| LIAT, Ltd. | Antigua | St George Parish, Antigua | $48,904.77 |
| Cathay Pacific Airways, Ltd. | Hong Kong | Hong Kong | $1,704.90 |
| Airtran Airways, Inc. | Delaware | Orlando, FL | $460.42 |
| Southwest Airlines | Texas | Dallas, TX | $236.96 |
| Swiss International Air Lines AG | Switzerland | Basel, Switzerland | $2,889.56 |

In light of this information, it is clear that complete diversity exists, as none of the airline carriers have either a principal place of business or place of incorporation in the Virgin Islands.[24]

---

[24] Defendants complain that Plaintiff has also not adequately pled or proven each airline's organizational structure. Again, however, the Court determines these facts from public record.

Nonetheless, these facts give rise to a different problem: all but one of the airline carriers –

American Airlines, Inc. – fails to meet the requisite amount in controversy of $75,000.[25] A

"single plaintiff may aggregate claims, even if the claims were assigned to the plaintiff by a third

party, unless the assignment was made collusively for the purpose of creating federal

jurisdiction." Airlines Reporting Corp. v. S & N Travel, Inc., 857 F. Supp. 1043, 1049

(E.D.N.Y. 1994), aff'd, 58 F.3d 857 (2d Cir. 1995). Where no such assignment exists, however,

and "[w]here multiple entities with similar claims against one defendant utilize a power of

attorney to allow their claims to be brought by one plaintiff, the claims may not be aggregated in

calculating the amount in controversy." Id.; see also Assurance Alliance, Inc. v. Kujak

Transport, Inc., 829 F. Supp. 1021, 1022 (N.D. Ill.1993); Monahan v. Pena, No. CIV.A.08-2258,

2009 WL 2579085 (E.D.N.Y. Aug. 19. 2009). As stated by the United States Supreme Court:

> Aggregation of plaintiffs' claim cannot be made merely because the claims are
> derived from a single instrument or because the plaintiffs have a community of
> interest . . . . In a diversity litigation the value of the "matter in controversy" is
> measured not by the monetary result of determining the principle involved, but by
> its pecuniary consequence to those involved in the litigation.

Thompson v. Gaskill, 315 U.S. 442, 447 (1942) (internal citations omitted). Thus, "[w]hen, as

here, each of several plaintiffs in a single lawsuit is asserting independent rights, each must

independently plead the jurisdictional amount." S&N Travel, 58 F.3d at 864 (quoting Cox v.

Livingston, 407 F.2d 392, 393 (2d Cir. 1969) (citations omitted)).

---

[25] Notably, Defendant Belfon did not raise the issue of amount in controversy in his briefing on
this Motion and Plaintiff contends that the Court should not consider it. It is well-established,
however, that "[e]ven if the parties have not raised the issue [of subject matter jurisdiction], a
Court of Appeals should examine its authority *sua sponte* during its review of the case."
Samuel-Bassett v. Kia Motors Am., Inc., 357 F.3d 392, 395 (3d Cir. 2004).

These principles, however, do not conclude the Court's inquiry. Indeed, the Court would be remiss to ignore 28 U.S.C. § 1367, which provides, in relevant part:

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).[26] In Exxon Mobil Corp. v. Allapattah Serv., Inc., 545 U.S. 546, 558-59 (2005), the United States Supreme Court, interpreting § 1367, held:

> The single question before us . . . is whether a diversity case in which the claims of some plaintiffs satisfy the amount-in-controversy requirement, but the claims of other plaintiffs do not, presents a 'civil action of which the district courts have original jurisdiction.' If the answer is yes, § 1367(a) confers supplemental jurisdiction over all claims, including those that do not independently satisfy the amount-in-controversy requirement, if the claims are part of the same Article III case or controversy. . . . We now conclude the answer must be yes.
>
> . . .
>
> If the court has original jurisdiction over a single claim in the complaint, it has original jurisdiction over a "civil action" within the meaning of § 1367(a), even if the civil action over which it has jurisdiction comprises fewer claims than were included in the complaint. Once the court determines it has original jurisdiction over the civil action, it can turn to the question whether it has a constitutional and statutory basis for exercising supplemental jurisdiction over the other claims in the action.

Id. at 558-59.[27] Accordingly, where the claims of two diverse plaintiffs – one of whom meets

---

[26] None of the exceptions enumerated in § 1367(b) applies.

[27] Although Allapattah was brought in the context of a class action, nothing in that case suggests that its holding should be limited to class actions. See Treat v. Thermoguard Equip., Inc., No. CIV.A.09-59, 2009 WL 2588865, at *2 n.1 (N.D. Okl. Aug. 19, 2009) (discussing the broader application of Allapattah's holding).

47

the amount in controversy and one of who does not – "derive from a common nucleus of operative fact" such that "the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case,'" the district court may exercise jurisdiction over all claims. Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 164-165 (1997) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966)) (alteration in original).

Here, it is undisputed that American Airlines satisfies all the requirements for diversity jurisdiction, as it is diverse from Defendants and alleges an amount in controversy well above the $75,000 threshold. The remaining airline carriers, all of whom are also diverse from Plaintiff, allege the identical claims based on the identical conduct by Defendants. Allowing these other carriers to litigate their claims jointly with American Airlines in federal court will require proof of no additional facts, particularly since all of the claims will be litigated through ARC as the Plaintiff. As such, the Court finds that all of the carriers' claims "derive from a common nucleus of operative fact" and thus form part of the same Article III case or controversy. The Court therefore exercises supplemental jurisdiction over the claims raised on behalf of all the carriers.

C.    **Conclusion as to Ronald Belfon's Motion to Dismiss**

In short, the Court finds that Plaintiff ARC had standing to bring this action, yet was not a real and substantial party to the controversy for purposes of determining the existence of subject matter jurisdiction. Although the airline carriers, who are the actual real parties to the controversy, are all diverse from Defendants, they do not satisfy the required amount in controversy. Nonetheless, because one of the carriers exceeds the $75,000 threshold and because

48

all of the carriers' claims derive from a common nucleus of operative fact, the Court maintains

supplemental jurisdiction over these claims. Therefore, Defendant Ronald Belfon's Motion to

Dismiss is denied.[28]

## V.    PLAINTIFF ARC'S MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review on a Motion for Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.

R. CIV. P. 56(c). A factual dispute is "material" only if it might affect the outcome of the case.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a

reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and

decide which is more probative, or to make credibility determinations. Boyle v. County of

Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v.

Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the

evidence, and all reasonable inferences which may be drawn from it, in the light most favorable

---

[28] In its Response, Plaintiff seeks sanctions against Ronald Belfon under 28 U.S.C. § 1927 in
connection with what it deems to be a "baseless" motion. As noted above, however, a substantial
portion of Defendant's Motion had merit and was well grounded in both fact and law. Nothing
in Plaintiff's § 1927 argument establishes the bad faith required to impose sanctions on
Defendant's counsel. See Grider v. Keystone Health Plan Central, Inc., 580 F.3d 119, 142 (3d
Cir. 2009) ("'sanctions may not be imposed under § 1927 absent a finding that counsel's conduct
resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal.'")
(quoting LaSalle Nat'l Bank v. First Conn. Holding Group, L.L.C. XXIII, 287 F.3d 279, 289 (3d
Cir. 2002)).

to the non-moving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)); <u>Tigg Corp. v. Dow Corning Corp.</u>, 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." <u>Id.</u> at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Elec.</u>, 475 U.S. at 586. "There must . . . be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." <u>Arbruster v. Unisys Corp.</u>, 32 F.3d 768, 777 (3d Cir. 1994), <u>abrogated on other grounds</u>, <u>Showalter v. Univ. of Pittsburgh Med. Ctr.</u>, 190 F.3d 231 (3d Cir. 1999). The mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

## B.  <u>Plaintiff's Evidentiary Objections</u>

As a preliminary matter, the Court takes note that Plaintiff has lodged extensive

objections to the evidence provided by Defendant Ronald Belfon's Response Brief.[29] Prior to

exploring the merits of Plaintiff's Motion for Summary Judgment, these multiple objections

require resolution.[30]

---

[29] Plaintiff objects to almost every piece of evidence submitted by Defendants on some
evidentiary ground. The Court already dealt with many of the parties' minor evidentiary
objections when reviewing their Statements of Facts and compiling a thorough summary of this
case. We do not repeat the discussion of these rulings here.

[30] Defendant Ronald Belfon submits a separate motion entitled "Motion to Strike ARC's
Improper Evidentiary Objections from its Combined Summary-Judgment Reply and from its
Reply to Belfon's Statement of Facts and Brief in Support." Specifically, he contends that
Plaintiff's objections are improper since they are made in a Reply Brief as opposed to a separate
motion to strike, as required by the Federal Rules of Civil Procedure and Virgin Islands
procedures. Moreover, he asserts that the objections are too unspecific for the Court to make any
particular ruling.
    As to Defendant's claim that evidentiary objections must be made by separate motion, his
only support comes from a one page memorandum by a U.S. Magistrate Judge in the Virgin
Islands to all Virgin Islands attorneys suggesting that attorneys should not combine responses or
replies with motions for other relief, but rather should file separate motions. (Def. R. Belfon's
Motion to Strike, Ex. 1.) This memorandum is neither a rule of law nor a binding procedural
order that makes it improper to file evidentiary objections in connection with a summary
judgment reply brief. Indeed, it is well-established that a party opposing summary judgment
must produce evidence "as would be admissible at trial." Celotex, 477 U.S. at 324. While the
Supreme Court rejected the view that a non moving party "must produce evidence in a form that
would be admissible at trial in order to avoid summary judgment," it has recognized that such
evidence may only be considered if it could later be reduced to an admissible form. Id.; see also
Blackburn v. UPS, Inc., 179 F.3d 81, 95-103 (3d Cir. 1999) (concluding that hearsay evidence
that was not capable of being admitted at trial could not be considered on a motion for summary
judgment). Thus, when a party points to potentially inadmissible evidence submitted either in
support of or against a motion for summary judgment, the Court must resolve that issue. Farris
v. County of Camden, 61 F. Supp. 2d 307, 322 (D.N.J. 1999).
    Defendant's Motion also argues that Plaintiff's evidentiary objections are not sufficiently
specific to permit the Court to make a ruling. This alleged failure, however, does not allow the
Court to blanketly reject all of Plaintiff's objections. Rather, where an objection is made
generally to a deposition without specifying the objectionable portion, the Court will disregard it.
Where an objection is specific and establishes that a precise portion of a deposition or affidavit is
inadmissible, the Court will strike that evidence and consider the remainder of the affidavit
and/or deposition. Accordingly, Defendant Belfon's Motion to Strike ARC's Improper
Evidentiary Objections is denied.

## 1.   <u>Deposition Testimony of Angela and Ronald Belfon</u>

In its first objection, Plaintiff contends that Defendants have used selected excerpts from their testimony to manufacture issues of fact that do not exist. More specifically, it claims that the Belfons' depositions are rife with contradictions that attempt to undermine otherwise inculpatory admissions. Citing to the sham affidavit rule, Plaintiff argues that "[a] party may not create a factual dispute to defeat summary judgment if the alleged ambiguities arise from affidavit or deposition statements that contradict earlier sworn testimony by the party." (Pl.'s Reply Br. Supp. Mot. Summ. J. 21.) It thus asks the Court to disregard portions of the Belfons' deposition testimony.

Plaintiff's claim is unfounded. Under the aptly named "sham affidavit" rule, "[a] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." <u>Baer v. Chase</u>, 392 F.3d 609, 624 (3d Cir. 2004) (citing <u>Hackman v. Valley Fair</u>, 932 F.2d 239, 241 (3d Cir. 1991)). In the case of a sham affidavit, the court will disregard "an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony." <u>Baer</u>, 392 F.3d at 624 (internal quotation marks omitted). The Third Circuit has explained the rationale for the doctrine as follows:

> A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the movant.

Jiminez v. All Am. Rathskeller, 503 F.3d 247, 253 (3d Cir. 2007).

For the sham affidavit rule to apply, however, the differing statements must be truly inconsistent. See Madden v. A.I. DuPont Hosp. for Children of the Nemours Found., 264 F.R.D. 209, 221 (E.D. Pa. 2010). Moreover, the inconsistency must be between two separate pieces of sworn testimony. If the discrepancy simply occurs within a deposition, as opposed to a subsequently prepared affidavit, an issue of fact remains which, if genuine, will preclude resolution of the case on summary judgment. See Mest v. Cabot Corp., 449 F.3d 502, 514 (3d Cir. 2006) (noting that while the credibility of a party's contradictory deposition testimony may be disputed, the summary judgment standard requires the court to look at the facts in the light most favorable to the non-moving party and reserve the issues of credibility for a jury); Simpler Consulting, Inc. v. Wall, No. CIV.A.05-452, 2008 WL 1710101, at *7-8 (W.D. Pa. Apr. 7, 2008) (noting that where party made conflicting statements in his deposition testimony as to material factual issue, the question of which story should be credited its to be submitted to a jury and not decided on summary judgment).

In the case at bar, Plaintiff fails to pinpoint, with any accuracy, testimony which is so clearly contradictory that it is clearly offered for "the purpose of defeating summary judgment." More importantly, all of the alleged contradictory testimony is found either within the same deposition or over the course of depositions taken in close temporal proximity, each of which occurred years before summary judgment proceedings commenced.[31] Plaintiff identifies no

---

[31] Plaintiff cites to Bank of Illinois v. Allied Signal Safety Restraint Sys., 75 F.3d 1162, 1168 (7th Cir. 1995) for the proposition that a material issue of fact to defeat summary judgment could not be created by deposition testimony that contradicted prior sworn statements made in another judicial proceeding. The parties' testimony in that case, though had clearly contradicted sworn

subsequent and/or recently-filed affidavit by either Ronald or Angela Belfon that contradicts previous statements. Nor does Plaintiff point to sworn testimony by the Belfons from prior proceedings that contradicts testimony given in this case.[32]

In short, Plaintiff asks the Court to disregard the Belfons' testimony to the extent it is damaging to Plaintiff's case, while crediting their testimony to the extent it benefits Plaintiff's case. This request is directly contrary to a court's role on summary judgment. Rather, given such an evidentiary conflict, it is incumbent upon the Court to take the evidence in the light most favorable to Defendants. As such, the Court overrules Plaintiff's first objection.

## 2. Affidavits of Felicia Maduro and Eleanor Garcia

Plaintiff next asserts that the affidavits of Felicia Maduro and Eleanor Garcia are inadmissible because both individuals admitted that their statements were not based on personal knowledge. Rather, they stated that they were summoned to Ronald Belfon's office, where they were asked to sign previously-prepared documents.

"It is a mandatory requirement that affidavits submitted in support of, or in opposition to, a motion for summary judgment be made on 'personal knowledge.'" Henry v. St. Croix Alumna, LLC, No. CIV.A.99-036, 2007 WL 6030275, at *3 (D.V.I. Aug. 10, 2007). "Statements in

---

testimony they had given in prior judicial proceedings – a situation not present in this case. Id. at 1170-71. The court expressly recognized that a witness's contradiction of himself within a deposition could create a genuine issue of fact for purposes of summary judgment. Id. at 1169-70.

[32] To the extent ARC relies on the memo that Ronald Belfon drafted in February 8, 2002, describing his role in WWT prior to 1997, its argument is inapposite. The 2002 document is unsworn testimony. Moreover, the memo discusses the time period before 1997, while Belfon's deposition discusses his role in WWT post-2001.

affidavits made only on belief or on information and belief may not be considered in support of or in opposition to summary judgment," Mosley v. City of Pittsburgh Public Sch. Dist., No. CIV.A.07-1560, 2009 WL 2948519, at *1 (W.D. Pa. Sep. 9, 2009), because such statements only have value when based on the affiant's personal knowledge. See Davis v. Portline Transportes Maritime Internacional, 16 F.3d 532, 537 n.6 (3d Cir. 1994).

In the present matter, the Court deems the affidavits of both Eleanor Garcia and Felicia Maduro admissible. Although Ms. Garcia testified at her 2008 deposition that she had not prepared her 2005 affidavit and could not recall the circumstances of her signing it, (Garcia Dep. 96:3-98:9), her memory lapse is unsurprising given the length of time between the two events. When subsequently questioned on a paragraph-by-paragraph basis about the substance of her affidavit, Ms. Garcia was able to clearly verify the foundation for her statements based on her experience and duties with WWT. (Id. at 96-120.) While Plaintiff's counsel was able to poke holes in the affidavit by identifying facts of which Ms. Garcia was not aware, such holes do not suggest that her affidavit, when signed, was not based on personal knowledge. Rather, they go to the weight and credibility to be given to that affidavit.

The same holds true for Felicia Maduro's affidavit. Like Ms. Garcia, Maduro's affidavit was signed in 2005, but her allegedly contradictory deposition did not take place until May of 2008. At that time, Ms. Maduro testified as to her years of experience as general manager of WWT and her involvement in providing financial information about WWT to Angela Belfon. (Maduro Dep. #2 50:2-51:17.) She also explained that she regularly spent forty hours a week at WWT, and considered herself knowledgeable about its business. (Maduro Dep. 88:18-89:4.) When asked about the signing of her affidavit, Ms. Maduro indicated that Ronald Belfon's

counsel asked her questions and she "was truthful in just putting down what – to [her] knowledge of the business and of the knowledge that Mr. Belfon, you know, had partake in." (Maduro Dep. #2 89:9-91:17.) Upon reviewing the affidavit paragraph by paragraph, Belfon's counsel again undermined the foundation of many of the statements she made in her affidavit and revealed that there may have been facts of which Maduro was unaware. (Id. at 91:18-98:23.) As before, though, these inconsistencies are for a factfinder's evaluation and do not suggest that the affidavit was not based upon personal knowledge when originally executed.

In short, both Maduro and Garcia were in positions within WWT to observe and comment upon the matters contained within their affidavits. While such affidavits may ultimately be discredited by the jury in light of their subsequent deposition testimony, that possibility does not allow the Court to strike them as inadmissible.

### 3. Expert Report of M. Martin Mercer

In its final evidentiary objection, Plaintiff seeks to exclude the report of Plaintiff's expert, M. Martin Mercer under Federal Rule of Evidence 702 and the Supreme Court case of Daubert v. Merrill Dow Pharm., 509 U.S. 579 (1993). Martin is a certified public accountant, who is also forensic CPA, a certified fraud examiner, and an attorney. (R. Belfon's Resp. to PSUF, Ex. 42 ("Mercer Report").) Upon review of discovery, pleadings, and depositions in this case, Mercer reached the following conclusions: (1) Angela Belfon treated WWT as her own personal business; (2) Ronald Belfon was not involved in the management of WWT; (3) WWT did not have a board of directors; (4) Angela Belfon did not share the financial information of WWT with Ronald Belfon; (5) because there was no functioning board of directors, none of the titular

directors had a fiduciary duty; and (6) if Ronald Belfon is deemed by the Court to be a director with a duty to the creditors, he is still protected by the "business judgment rule." Ultimately, Mercer opined that Ronald Belfon never acted in any fiduciary capacity for WWT.[33]

The Supreme Court has explained that district court judges perform a "gatekeeping role" with respect to expert testimony by assessing whether such testimony is admissible under Federal Rule of Evidence 702. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590-91, 597 (1993); see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 146-47 (1999) (extending Daubert to testimony about "technical or other specialized knowledge") (internal quotations and citations omitted). Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. When the expert testimony at issue is not scientific, "the court must determine whether the expert is qualified to provide such an opinion, whether the testimony assists the fact-finder, whether the testimony is reliable and whether the testimony 'fits' the facts of the case." D & D Assoc., Inc. v. Bd. of Educ. of N. Plainfield, 411 F. Supp. 2d 483, 487-88 (D.N.J. 2006), aff'd, 2006 WL 755984 (D.N.J. Mar. 20, 2006). "'Expert testimony which does

---

[33] While the Court would normally rule on this issue via a separate Daubert motion, the fact remains that both sides have fully briefed the matter. As this case is already replete with motions, the Court will not, for the mere sake of formality, require that this issue be the subject of an entirely new motion simply to determine whether we can consider this report on summary judgment.

not relate to any issue in the case is not relevant and, ergo, non-helpful.'" In re Unisys Savings Plan Litig., 173 F.3d 145, 162 (3d Cir. 1999) (quoting Daubert, 509 U.S. at 591).

Under Federal Rule of Civil Procedure 704, an expert may provide an opinion that embraces an ultimate issue to be decided by the trier of fact. FED. R. EVID. 704. Nonetheless, "[t]he district court must limit expert testimony so as to not allow experts to opine on 'what the law required' or 'testify as to the governing law.'" Casper v. SMG, 389 F. Supp. 2d 618, 621 (D.N.J.2005) (quoting U.S. v. Leo, 941 F.2d 181, 196-97 (3d Cir. 1991)). "[T]he purpose of the rule excluding expert opinions on legal issues is to avoid confusing the jury or usurping the role of the judge in instructing the jury on the relevant law." Suter v. Gen. Accident Ins. Co. of Am., 424 F. Supp. 2d 781, 793 (D.N.J. 2006). Thus, when an expert purports to testify as to the ultimate *legal* issue, that testimony is not admissible and should not be considered on summary judgment. See, e.g., Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Plan and Trust Agreement, 812 F. Supp. 1376, 1378-79 (E.D. Pa. 1992) (holding that proposed expert testimony as to propriety of employer's requiring employee to sign general release as condition of receiving pension benefits would take form of opinion on question of law and, thus, was inadmissible); Walsh v. Principal Life Ins. Co., 266 F.R.D. 232, 238 (S.D. Iowa 2010) ("expert testimony on legal matters is not admissible. Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them.").

"Notwithstanding this admonition, the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 218 (3d Cir. 2006). Expert testimony as to

business custom and practice is generally admissible. Id. Thus, in such cases, courts have found

it helpful to permit the testimony of experts as to the standards of conduct against which the

conduct of boards of directors is measured, without allowing that testimony to stray into the legal

question of whether applicable duties were breached. See, e.g., PFS Distrib. Co. v. Raduechel,

574 F.3d 580, 597 (8th Cir. 2009) (holding that testimony of accounting expert – who opined that

accountant acted in compliance with professional accounting standards – and bank expert – who

testified that bank correctly handled relevant file under banking standards – were relevant to

knowledge or state of mind of accountant and bank vice president and, thus, were admissible in

trial on claims against accountant and vice president under Iowa law for conspiracy and aiding

and abetting employees' breach of fiduciary duty to employer); CDX Liquidating Trust ex rel.

CDX Liquidating Trustee v. Venrock Assoc., 411 B.R. 571, 588 (N.D. Ill. 2009) (holding that

while expert may not opine about whether defendants breached their applicable fiduciary duties

nor apply the law to specific actions taken in this case, he may testify about defendants' conduct

in light of industry practices and standards); In re Commercial Money Ctr., Inc., ___ F.R.D. ___,

No. CIV.A.02-16022, 2010 WL 2991526, at *10 (N.D. Oh. July 27, 2010) (holding that experts

may testify as to content of industry standards, but could not testify as to breach of those

standards); Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co., No. CIV.A.04-1587, 2007

WL 831613, at *3 (S.D. Ind. Mar. 5, 2007) (finding legal conclusion that goes to the heart of

breach of fiduciary duty and constructive fraud claims inadmissible); Floyd v. Hefner, 556 F.

Supp. 2d 617, 640 (S.D. Tex. 2008) (finding that expert could testify as to standards of conduct

applicable to directors in general, but could not testify as to whether the defendants' conduct

comported with the actions of reasonably prudent individuals in the same or similar

59

circumstances; "[t]he latter is a conclusion that must be determined by the trier of fact.").[34]

In the present matter, Plaintiff seeks to exclude the Mercer report from consideration for two reasons. First, it contends that Mercer improperly proposes to testify about an ultimate issue of law. The Court agrees in part and disagrees in part with this claim. To the extent Mr. Mercer testifies as to his understanding of industry standards, Angela and Ronald Belfon's functional – as opposed to titular – roles within the corporation, and the fiduciary members of a board of directors generally, his testimony is both relevant and helpful to assist a trier of fact in determining the existence and breach of a fiduciary duty by the various Defendants.[35]

To the extent, however, that Mr. Mercer opines that if Ronald Belfon is deemed to be a director he is still protected by the "business judgment rule," his report is inadmissible. The business judgment rule is a purely legal doctrine that "'insulates an officer or director of a corporation from liability for a business decision made in good faith if he is not interested in the subject of the business judgment, is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances, and rationally believes that the business judgment is in the best interests of the corporation.'" Am. Society for Testing & Materials v. Corrpro Cos., Inc., 478 F.3d 557, 572 (3d Cir. 2007) (quoting

---

[34] Plaintiff's improperly cites In re Unisys Sav. Plan Litig., 74 F.3d 420 (3d Cir. 1996) for the proposition that an expert report opining as to a breach of fiduciary duties is admissible. In that case, however, no party raised a Daubert challenge to the admissibility of that report. Rather, the court cursorily cited the report as evidence that supported a denial of summary judgment without any discussion as to admissibility. Id. at 437.

[35] Although, as Plaintiff points out, Mr. Mercer uses some legal terminology when reaching these conclusions, nothing in the conclusions themselves suggest that he is opining as to an issue of law.

Cuker v. Mikalauskas, 692 A.2d 1042, 1045 (Pa. 1997)). As the rule is a legal creation, any attempt by Mr. Mercer to define and apply the business judgment rule to the present case constitutes an attempted usurping of the roles of both the Court and the jury in this case. Mercer's description of the boundaries of the business judgment rule falls squarely within the province of the Court and would not, in any way, benefit the factfinder. Accordingly, this portion of Mercer's opinion is inadmissible and will not be considered by the Court during summary judgment proceedings.

Plaintiff's second argument for the exclusion of Mercer's testimony contends that the factual conclusions in his report are "fatally flawed and inherently unreliable" because Defendants failed to provide him with much of the evidence that confirms Mr. Belfon's involvement with WWT. This argument, however, goes to the weight of Mercer's testimony and not his reliability. See Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 809 (3d Cir. 1997) (holding that questions as to the factual basis for an expert opinion go to weight rather than admissibility). Plaintiff is free to raise any deficiencies in Mercer's conclusions, which the Court will consider when ascertaining the existence of a genuine issue of material fact.[36]

## C.    **Discussion of Merits**

Having resolved these evidentiary issues, the Court now turns to Plaintiff's request for summary judgment against the three Defendants on Counts I (breach of fiduciary duty), II (conversion), and III (fraud) of its Complaint. Although Plaintiff fully briefs its claims for both

---

[36] In a final effort to exclude the Mercer Report, Plaintiff argues that his legal opinion is given in affidavit form and it is improper for affidavits to embody legal arguments. This Court, however, has already found that to the extent Mercer's report contains a legal opinion, it is inadmissible and will not be considered.

breach of fiduciary duty and conversion, it makes only cursory mention of the fraud count and

fails to direct this Court to any law regarding the standard for proving fraud. Such a passing

reference is insufficient to raise this issue for review. See Gorum v. Sessions, 561 F.3d 179, 185

n.4 (3d Cir. 2009) ("An issue is waived unless a party raises it in its opening brief, and for those

purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this

court.'") (quoting Laborers' Intern. Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.,

26 F.3d 375, 398 (3d Cir.1994)). Accordingly, the Court considers Plaintiff's Motion only as to

Counts I and II of the Complaint.

### 1.    Breach of Fiduciary Duty and Corporate Fiduciary Duty

Plaintiff first asserts that all three Defendants, as officers and directors of WWT, have

breached fiduciary duties owed to ARC. Virgin Islands law recognizes that officers and directors

of corporation bear potential liability for their actions in their corporate capacities, as follows:

> The District Court of the United States Virgin Islands shall have jurisdiction over
> the directors, managers, trustees and other officers of a corporation organized
> under this chapter, and of any foreign corporation admitted to do business in the
> United States Virgin Islands, to-
>
> (1) compel such directors, managers, trustees and other officers to account for their
> official conduct in the management and disposition of the funds, property and business
> committed to their charge;
>
> (2) order, decree and compel payment by them to the corporation which they
> represent, and to its creditors of all sums of money and all the value of all property
> which they may have acquired to themselves, or transferred to others, or may have
> lost or wasted by any violation of their duties or abuse of their powers, by such
> directors, managers, trustees or other officers of such corporation;

V.I. CODE ANN. tit. 13 § 341. Although neither party cites to – and this Court's own search does

not reveal — any Virgin Islands law describing the nature of an officer or director's fiduciary duty, other jurisdictions within the Third Circuit have provided persuasive guidance in this area. In general, the standard used to determine whether an officer or director breached his or her fiduciary duty is whether he or she performed "his or her duties in good faith and in a manner reasonably believed to be in the best interest of the corporation. The director must utilize such care, skill and diligence as would a person of ordinary intelligence under similar circumstances." In re Forman Enter., Inc., 281 B.R. 600, 610 (Bankr. W.D. Pa. 2002). Once a fiduciary duty is imposed on a corporate director, "[t]he test for liability for breach of fiduciary duty is whether a director was unjustly enriched by his or her actions." Forman, 281 B.R. at 610. The benefit to the fiduciary that gives rise to the breach may be indirect. In re Total Containment, Inc., 335 B.R. 589, 604 (Bankr. E.D. Pa. 2005).

In this case, Plaintiff cites two theories on which to rest a claim of breach of fiduciary duty against the three Defendants. First, as to its Count I claim of breach of fiduciary duty, Plaintiff asserts that the three Defendants owed fiduciary duties directly to ARC as officers and directors of an insolvent corporation. Second, as to its claim of breach of corporate fiduciary duty, Plaintiff contends that the ARA created an express trust breached by WWT and for which Defendants are personally liable under a participation theory. For ease of discussion, the Court initially considers whether Defendants owed fiduciary duties under either of the two theories put forward by WWT. Thereafter, the analysis turns to whether any or all of the Defendants have breached those duties.

a.  **Sources of Defendants' Fiduciary Duty**

   i.  **Defendants' Duties as Officers and/or Directors of an
       Insolvent Corporation**

First, Plaintiff correctly argues that Defendants' liability for breach of fiduciary duty can

be grounded in their status as officers and directors of an insolvent corporation.  Although Virgin

Islands law is virtually silent on this issue, multiple jurisdictions within the Third Circuit have

embraced the generally accepted principle that where a company becomes insolvent, the fiduciary

duty owed by corporate officers and directors shifts to the company's creditors.  See Bd. of

Trustees v. Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 173 (3d Cir.

2002); In re Scott Acquisition Corp., 344 B.R. 283, 286 (Bankr. D. Del. 2006) (Delaware law); In

re Total Containment, Inc., 335 B.R. 589, 603 (Bankr. E.D. Pa. 2005) (Pennsylvania law); In re

Bagel, Adv. No. 92-0675, 1992 WL 477052, at *16-17 (Bankr. E.D. Pa. Dec. 17, 1992)

(Pennsylvania law); In re Carretta, 219 B.R. 66, 75-76 (Bankr. D.N.J. 2008) (New Jersey law).  It

is thus well-established that the corporate officer of an insolvent corporation has a fiduciary duty

to creditors to manage corporate affairs.  Bagel, 1992 WL 477052, at *15 (citing Sicardi v.

Keystone Oil Co., 24 A. 163, 164 (Pa. 1892); see also Voest-Alpine Trading USA v. Vantage

Steel Corp., 919 F.2d 206, 209 & 217 n. 25 (3d Cir. 1990); Brown v. Presbyterian Ministers

Fund, 484 F.2d 998, 1005 (3d Cir. 1973)).

In this case, Plaintiff's expert, David O'Connell opined that WWT was insolvent both on

December 31, 2000 and December 31, 2001.  (Ex. 18.)  As of August 8, 2002, WWT was in

bankruptcy.  Because Defendants have submitted no contrary evidence to create a factual

discrepancy on this issue, this Court must find these conclusions to be true.  The three

Defendants were all directors of WWT from December 31, 2000 onward and thereby owed fiduciary duties directly to creditors of WWT who, in this case, included Plaintiff ARC.

## ii.    The ARA as an Express Trust

In an alternative theory, Plaintiff argues that the ARA constituted an express trust, wherein WWT was the Trustee, ARC and the carriers were the beneficiaries, and the *res* was ARC's proceeds in the ticket sales. As already found by the bankruptcy court, WWT breached that express trust. Because WWT could act only through its officers and directors and because the Virgin Islands recognizes a participation theory of liability, Plaintiff now contends that it is entitled to summary judgment on its breach of corporate fiduciary duty claim.

Courts in the Virgin Islands look to the Restatements of the Law in the absence of local law to the contrary. V.I. CODE ANN. tit. 1 § 4. Under the Restatement, a trust is "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." RESTATEMENT (SECOND) OF TRUSTS § 2 (1959). "A person in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within the scope of the relation. Id. cmt. b.

In Matter of Penn Central Transp. Co., the Third Circuit had the opportunity to consider whether an arrangement analogous to the ARA arrangement at issue here constituted an express trust. 486 F.2d 519 (3d Cir. 1973). Under the arrangement controlled by industry practices and rules of the Association of American Railroads ("AAR"), all freight and passenger charges for various interline rail carriers were collected by either the originating or destination carriers for

services performed by the interline railroads and, in turn, the collected funds would be deposited in the collecting carriers' general accounts. Id. at 523. The destination railroad was responsible for preparing and settling interline freight accounts and prepared an "abstract" on which the appropriate freight charges were allocated among the participating carriers. Id. It then sent copies of the abstract to the other carriers who could then immediately draw a draft on the destination railroad for the net balance due for the month. Id. In other words, "[t]he monies collected belong[ed] only in part to the collecting railroad; as to monies owed other railroads, the collecting railroad serve[d] merely as a receiving and transmitting agent." Id. at 523-24. In that case, defendant Penn Central had not paid for approximately $15 million charges and declined drafts submitted by other carriers. Id. at 523. The Third Circuit found that, under the Restatement (Second) of Trusts, "[a] common sense interpretation of this system would indicate that funds collected by one railroad for and in behalf of another railroad are held in trust by the collecting railroad until the monies are transmitted." Id. at 524. It found significant the fact that there was no provision for the payment of interest by the collecting carrier and gave little weight to the fact that funds had been commingled. Id.

Similarly, in In re Ellison, 296 F.3d 266 (4th Cir. 2002), Airlines Reporting Corporation commenced an adversary proceeding in the Chapter 7 bankruptcy of two individual defendants, who were officers, directors, and shareholders of Sovereign World Travel, Ltd. ("Sovereign"), a West Virginia Corporation operating a travel agency. Id. at 268. As in the present case, Sovereign entered into an Agent Reporting Agreement with ARC, under which Sovereign collected payments for the sales of airline tickets, placed the proceeds of those sales in a trust account with a designated bank for the benefit of ARC, and reported to ARC weekly on the ticket

sales made to customers. The deposited proceeds, excluding Sovereign Travel's commissions, were designated as "the property of the carrier and [were to] be held in trust until accounted for to the carrier." Id. After Sovereign Travel submitted its sales report to ARC, ARC paid itself with checks that ARC drew on the trust account. Id. In connection with this arrangement, the individual defendants also signed personal guarantees of performance and assumed the liabilities and obligations of Sovereign Travel. Id. at 269. At some point, Sovereign began experiencing financial difficulties, failed to deposit proceeds of the ticket sales into its trust account, and failed to submit weekly sales reports to ARC. Id. The Fourth Circuit expressly found that "Sovereign Travels's indebtedness to ARC arose out of the breach of a fiduciary relationship between the two corporations." Id. at 270. It explained that under the Agent Reporting Agreement, Sovereign Travel was obliged to collect payments for the sale of tickets and place those payments in a trust account with the bank for the benefit of ARC and subject only to ARC's withdrawals. The Agent Reporting Agreement provided that these proceeds, less commissions due to Sovereign Travel, were the "property of the carriers," to be "held in trust" by Sovereign Travel "until satisfactorily accounted for to the carriers." Id. at 271.

In this case, the Court has little trouble concluding that the ARA formed an express trust between WWT and ARC. Under the ARA, WWT was bound to hold money collected for sales of airline tickets in trust in a designated bank account for the benefit of the airline carriers. Although WWT commingled funds, ARC had the authority to immediately debit the designated account for the amount owed upon WWT's weekly reporting of sales. Moreover, Section VIII.A.9 of the ARA specifically states that, "[a]ll monies and credit card billing documents, less applicable commission, collected by [WWT] for sales hereunder *are property of the carriers*, and

shall be held in trust by the Agent until satisfactorily accounted for to the carriers." (ARA §

VIII.A.9 (emphasis added).) In their Response, Defendants do not contest that there was indeed

an express trust between ARA and WWT. Given these circumstances, the Court finds that an

express trust existed between ARC and WWT and that the Defendants could be liable for

WWT's breach of fiduciary duty in connection with that trust if they participated in its

commission.

### b. Whether Any Defendant Breached His or Her Fiduciary Duty to WWT

The mere existence of such fiduciary duties owed directly by Defendants to Plaintiff

during the relevant periods does not end this Court's inquiry. Rather, the Court must now turn to

whether Defendants are individually responsible for any breach of that duty. To resolve this

issue, it is insufficient to simply find that WWT as a whole breached a fiduciary duty, thereby

rendering its officers and directors liable. Rather, the Court must separately analyze each

Defendant's role in any breach and determine whether his or her actions make him/her legally

liable.[37]

### i. Angela Belfon

Plaintiff sets forth two broad categories of evidence to establish Angela Belfon's liability

---

[37] Notably, the fiduciary duty of a director/officer of an insolvent corporation is one running directly from the director/officer to the creditor and does not require any showing of actual participation. The fiduciary duty created by the express trust, on the other hand, runs from WWT as trustee to ARC and the carriers as beneficiaries. This latter duty requires the Defendants' actual "participation" in any breach by WWT. That "participation theory" is defined later in this Memorandum. For purposes of analyzing Plaintiff's Motion for Summary Judgment for breach of fiduciary duty, the Court relies on the lighter standard required to prove that the Defendants breached their fiduciary duties as directors/officers of an insolvent corporation.

for WWT's breach of fiduciary duty. First, it claims that Angela Belfon purposely manipulated

the amount and timing of the ARC debits to avoid having WWT's accounts overdrawn by ARC.

It argues as follows:

> Ms. Maduro and Mrs. Belfon both testified that Mrs. Belfon was the person who approved the amount stated in the settlement authorization that ARC was authorized to debit from WWT's bank account. . . .Mrs. Belfon clearly understood that the settlement authorization was WWT's approval for ARC to debit WWT's designated account; that by mailing the weekly report she was authorizing ARC to debit to WWT's account; that ARC could *only* debit up to the amount so authorized; and that if WWT failed to report sales, or delayed in mailing the sales reports, the ARC debits would be reduced or delayed. It is undisputed that ARC gave advance notice of the audit that commenced on July 30, 2002, and it is undisputed that Angela Belfon then *personally* placed the two July 21, 2002 reports and the July 28, 2002 report in the mail. . . .

> Mrs. Belfon frequently presented herself as confused or clueless, but she was crystal clear when she testified that ARC could only debit up to the amount she authorized. . . . Ms. Maduro testified that Mrs. Belfon was the person who decided that WWT should cease electronic reporting and return to paper/mail reporting; a decision that allowed her to continue manipulating the content and timing of the weekly reports so that WWT could illegally use ARC's proceeds to support its failing business. . . .

> Ms. Maduro *admitted* during the 2004 examination that she was instruction by her supervisors to hold back sales reports to "keep our cash flow going and keep the business afloat" . . ., **"so that they can – so they could keep their head above water."** . . . It is undisputed that Ms. Maduro's immediate supervisor was Angela Belfon, and that she consulted with Verne David on financial matters, and with Ronald Belfon on legal matters. . . .

> Mrs. Belfon contends that "sometimes she would delay reporting sales made to the Government when the Government delayed payment". . . . This "fact" is contradicted by the books and records of WWT and ARC, and by the Banco Popular account statements. The authenticity and accuracy of the ARC Agent Sales Summaries and the WWT bank records are undisputed. . . . These documents conclusively establish that between April, 2002 and August 2002, WWT's ticket sales were consistently reported out of period, and WWT's weekly sales reports were submitted 2-3 weeks late, which allowed WWT to accumulate a

deficit to ARC of over $500,000. . . . It is undisputed that the GTR Accounts Receivable list submitted to the United States Trustee and verified under oath by Ms. Maduro at the Rule 2004 Examination identified a total of *only* $69,845 in "GTR" receivables as of August, 2002.

(Pl.'s Reply Br. 7-8 (citations to evidence omitted).)

This abundance of evidence, however, is countered with an equal amount of testimony suggesting that Mrs. Belfon had nothing to do with preparation of reports to ARC. Angela Belfon understood that WWT had an obligation to submit reports to ARC in a timely fashion, so as to authorize ARC to debit WWT's accounts for the sales. (A. Belfon Dep. 129:2-13.) Although Mrs. Belfon admitted to physically mailing the reports after they were completed, she denied having any involvement in actually creating those reports. (Maduro Dep. #2 44:1-4; A. Belfon Dep. 121:15-20, 130:8-13.) According to the evidence, Felicia Maduro, general manager of WWT, was primarily responsible for the preparation of the weekly reports to ARC. (Maduro Dep. 9:2-10:3; Maduro Dep. #2 5:10-21.) Indeed, Mrs. Belfon put all responsibility for the reports on Mrs. Maduro. (A. Belfon Dep. 34:9-25:9.) Similarly, as to WWT's discontinued use of the electronic reporting system, Mrs. Belfon denied ever discussing such a situation with Ms. Maduro. (Maduro Dep. 39:13-24; A. Belfon Dep. 81:11-18.)

With respect to the holding back of ticket sales from the ARC reports, Maduro testified that she was instructed to hold by sales by her "supervisors," which could or could not have been Angela Belfon. (Maduro Dep. 67:17-68:17.) Mrs. Maduro also indicated that the company was trying to catch up with its reporting and go back on a regular week to week basis of reporting, suggesting that WWT was trying to comply with its obligations. (Id. at 67:17-68:6.) Mrs. Belfon admitted that she may not report sales if she had not collected from a customer yet, but flatly

70

denied that she ever instructed Ms. Maduro to withhold sales. (A. Belfon Dep. 106:2-107:9.) Such testimony creates a factual conflict which this Court cannot resolve.

The second category of evidence that Plaintiff submits to establish Angela Belfon's breach of fiduciary duty asserts that she improperly diverted ARC's proceeds to pay the Belfon loan while WWT was insolvent. Specifically, it argues:

> It is undisputed that Angela Belfon and Verne David were the only signatories to WWT's bank accounts during the period that WWT did business with ARC. . . . It is undisputed that WWT was insolvent as of December 31, 2000, and that WWT was still insolvent as of December 31, 2001. . . . It is undisputed that checks were issued to Ronald and Angela Belfon to pay off a $92,000 shareholder loan while WWT was insolvent and while WWT was diverting ARC's proceeds. . . . It is undisputed WWT in fact repaid the loan through a series of checks made out to "Ronald and Angela Belfon." It is undisputed that the Belfons accepted and cashed the checks. . . . It is undisputed that Mrs. Belfon received the report she requested from Ms. Maduro showing payments to "Ronald and Angela Belfon," yet she never instructed Ms. Maduro to remove Mr. Belfon's name as a payee on the checks. . . .
>
> It is undisputed that WWT's corporate income tax returns filed under penalty of perjury for 2000 and 2001 confirm that the $92,000 "shareholder loan" was fully repaid by year end 2001. . . . Mrs. Belfon cannot dispute this fact; she testified that she did not know if the loan was fully repaid. . . . Mrs. Belfon's statement to Ms. Maduro about who made the loan is not hearsay – it is a party admission made by WWT's authorized representative during the WWT bankruptcy case. Fed. Rule Evid. 801(d)(2). It is also admissible as an admission by WWT, through its general manager, corroborated by WWT's business records, as to how the company booked and repaid the load. Fed. R. Evid. 803(6).

(Pl's Reply Br. 9.)

Notwithstanding such evidence, however, Defendants have produced ample evidence to contradict Plaintiff's assertion that Mrs. Belfon diverted assets for her own benefit while WWT was insolvent. Angela Belfon testified that she alone made a loan to WWT in the amount of

$92,000. (A. Belfon Dep. 42:5-45:1, 50:2-51:6.) According to the evidence, $46,000 of that loan was repaid between March 19, 1999 and February 14, 2001. (Id. at Ex. 21.) The evidence reflects that WWT's first period of insolvency was as of December 31, 2000, prior to which $43,000 had already been paid. Thereafter, aside from the expert report of Mr. Mercer, no evidence exists that there was any further reimbursement on this particular loan. When asked whether she knew whether the loan was repaid in full, Ms. Maduro, who was in charge of issuing the checks, stated, "[n]ot to my knowledge, I don't know. I don't remember." (Maduro Dep. #2 79:23-80:2.) Plaintiff provides no evidence of checks issued on the loan after February 2001. Although Plaintiff repeatedly cites to WWT's corporate tax returns for 2000 and 2001 reflecting that the loan was repaid, those returns – which Plaintiff claims to have included with the O'Connell report – can be found nowhere in Plaintiff's binders of exhibits. Finally, to the extent Plaintiff relies solely on O'Connell's testimony, O'Connell opined only that "during the period from December 31, 1999 through December 31, 2001 $74,000 of Stockholder Loans were repaid $24,000 during the year ended December 31, 2000 and $50,000 during the year December 31, 2001." (Ex. 18 at 4.) There is no clear indication of either the basis of this information or that all $92,000 of the Belfon loan was ever repaid during a period of insolvency.

In sum, the Court recognizes that much of Defendants' evidence as to Angela Belfon is based on denials and testimony that may not carry full credibility with the jury. Such credibility determinations, however, are not within the Court's province on a motion for summary judgment. Rather, prevailing jurisprudence requires that the Court view the evidence in the light most favorable to the non-moving party. Doing so reveals a genuine issue of material fact as to whether Angela Belfon breached a fiduciary duty owed to ARC.

## ii.    Verne David[38]

Plaintiff's claim for breach of fiduciary duty against Defendant Verne David is as

follows:

> Verne David Prepared the False and Misleading Balance Sheets. Felicia Maduro
> unequivocally denied any role in preparing balance sheets or submitting financial
> information for the ARC bond. . . . She testified that Verne David was
> responsible for the yearly bond renewals. . . . Ms. Maduro testified that Verne
> David took over financial management after Ms. Williams died and Verne David
> was responsible for financial statements and balance sheets. . . . Eleanor Garcia
> denied any role in submitting financial information for the bond, beyond her
> admission that she faxed the "revised" 2001 balance sheet that was prepared for
> her by "someone" at WWT. . . . Ms. Maduro flatly stated that she would not have
> sent the "revised" 2001 statement had she been if asked "because it's not right.". .
>
> Angela Belfon alleges: "Eleanor [Garcia] and Verne [David] prepared
> balance sheets and income statements." . . . Ms. Garcia testified that she gave the
> expense information to Mr. David and prepared the profit and loss statements and
> balance sheets. . . . Financial issues like overdrafts were for Verne David to
> address.
>
> Ms. Garcia testified that a company's known liabilities should appear on
> the balance sheet, but denied any knowledge as to why this information did not
> appear on WWT's balance sheets. . . . She put this responsibility on Verne David.
> . . . Ms. Garcia reluctantly admitted that she faxed the "revised" 2001 financials
> to Duffy, but claimed she could not recall how the document came into her
> possession while she was at her office at the Department of Tourism. . . . The
> only thing Ms. Garcia was sure about was that she did not create the "revised"
> 2001 balance sheet.

_____

[38] The Court notes that Defendant David has failed to file a Response to Plaintiff's Motion for
Summary Judgment. That failure, however, does not automatically entitle Plaintiff to summary
judgment against him. Federal Rule of Civil Procedure 56(e) states that if a party does not
respond to a motion for summary judgment against it, "summary judgment should, *if
appropriate*, be entered against that party." FED. R. CIV. P. 56(e)(2) (emphasis added). The
Third Circuit has expressly held that, in the absence of a response, a district court not enter
summary judgment unless the facts set forth in the motion entitled the moving party to judgment
as a matter of law. Anchorage Assoc. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 176
(3d Cir. 1990). Accordingly, the Court will independently review the expansive record to
determine whether summary judgment on Counts I, II, and III of the Complaint should be entered
against Defendant David.

> Verne David and Angela Belfon Wrongfully Placed a Stop Order on ARC's Pre
> Authorized Debit. On August 7, 2002, Verne David, in the presence of Angela
> Belfon, called Banco Popular with an urgent request to stop ARC's pre-authorized
> debit. . . . The stop order call was a breach of the ARA. . . . [citation to evidence
> verifying that Verne David made the call].

(Pl.'s Reply Br. 14-16 (citations to evidence omitted).)

Such evidence, however, is disputed. Both parties agree that David, along with Angela

Belfon, was an authorized signatory on the designated WWT account. (A. Belfon Dep. 21:2-3 &

Ex. 6; Garcia Dep.13:20-24; Maduro Dep. #2 96:15-24; Pl.'s Reply to R. Belfon's Additional

Facts ¶ 139.) The agreement, however, ends there. Notwithstanding Maduro's statements to the

contrary, Ms. Garcia testified that although Mr. David would provide information for loan

receivables, leasehold improvements, depreciation, and liabilities, both Maduro and Garcia

conceded that he was not the sole source of information for the balance sheets. (Garcia Dep.

34:14-40:3.) In fact, Mrs. Belfon testified that Ms. Maduro was solely responsible for

preparation of the balance sheets. (A. Belfon Dep. 60:11-61:6.) Most of the documentation was

prepared by her and, according to Mrs. Belfon, none of these documents were provided to the

Belfons for their general information. (Id. at 60:18-61:6.) Mrs. Belfon indicated that she never

discussed the financial situation of the company at all with Mr. David. (Id. at 49:4-19; 103:24-

104:3.) Moreover, as to the stop order request, Mr. David testified that Mrs. Belfon told him the

stop order was not his decision, but was performed "on advice of counsel." (David Dep. 86.)

In light of the sparse and contradicted evidence as to what role, if any, Mr. David had in

WWT's wrongdoings that resulted in its indebtedness to ARC, a genuine issue of material fact

exists. Accordingly, the Court declines to grant Plaintiff's motion for summary judgment on the

claim of breach of fiduciary duty against Defendant David.

### iii. **Ronald Belfon**

Finally, ARC seeks summary judgment on its breach of fiduciary claim against Defendant

Ronald Belfon. Plaintiff's evidence against this Defendant falls into four groupings, which the

Court discusses each individually.[39]

#### Involvement in the ARC Bond as Facilitator and Indemnitor

Plaintiff's first argument against Mr. Belfon revolves around the initial bond that WWT

needed to obtain to be an ARC accredited agent. Plaintiff notes that to maintain this bond, WWT

submitted false and misleading balance sheets for 2000 and 2001 that failed to disclose that

WWT accumulated a $200,000+ liability to ARC for unreported sales. As to Ronald Belfon's

involvement, Plaintiff argues:

> When it came to balance sheets, financial statements and the bond, Mrs. Belfon –
> incredibly – claimed complete and total ignorance. She claimed she never heard
> of Colin Wilson, the New York attorney with offices next to Belfon family friend
> Clifford Charles who handled the WWT's bond applications. She claimed she
> never read the tax returns. She claimed she did not know if the shareholder loan
> was paid. She testified that she did not know how WWT accumulated a $600,000
> deficit to ARC. . . .

---

[39] Notably, Ronald Belfon also filed his own Motion for Summary Judgment on all claims
against him. With respect to that Motion, Rule 56 shifts to him the burden of proving the
absence of a genuine issue of material fact. As stated by the Third Circuit, "'[c]ross-motions are
no more than a claim by each side that it alone is entitled to summary judgment, and the making
of such inherently contradictory claims does not constitute an agreement that if one is rejected the
other is necessarily justified or that the losing party waives judicial consideration and
determination of whether genuine issues of material fact exist.'" Lawrence v. City of
Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008) (quoting Rains v. Cascade Indus., Inc., 402 F.2d
241, 245 (3d Cir. 1968)). Accordingly, the Court considers that Motion separately.

It is undisputed that after Ms. Williams died, Mr. Belfon became well-versed in WWT's financial affairs. Mr. Belfon know WWT's financial affairs and records were in "disarray" after Ms. Williams died. Mr. Belfon knew WWT had to get into financial order to qualify for the ARC bond. Mr. Belfon brought in Mr. Charles to computerize WWT's accounting system to accomplish this task. . . . Mr. Belfon authorized his wife to sign his name to the USF&G Indemnity. . . . Mr. Belfon is an experienced lawyer who served as WWT's 20 hour per week legal advisor – he knew, or should have known, the significance of authorizing his signature to an Indemnity Agreement with a bonding company. Mr. Belfon used his position as an indemnitor to submit false and misleading information to submit false and misleading information to USF&G, which delayed payment on ARC's claim to bond proceeds for several months. . . .

(Pl.'s Reply Br. 10-11 (citations to evidence omitted).)

None of the evidence cited by Plaintiff, however, supports a clear finding that Mr. Belfon was actively involved in obtaining or maintaining the USF&G bond. Plaintiff correctly notes that Ronald Belfon familiarized himself with WWT's finances in 1997 after the death of Joanne Williams in 1997, and was involved in some discussions with Williams's husband regarding a loan previously given by Williams. (Ex. 9 at RB782-786.) Plaintiff, however, failed to show that any of his involvement was at all relevant to the events in this dispute. As to the USF&G bond, Ronald Belfon's signature was executed for him by his wife Angela Belfon. (A. Belfon Dep. 11:1-22; Filice Dep. 8:15-16:14 & Ex. 1; R. Belfon Dep. 18:1-19:7; 20:3-6.) As such, it does not, standing alone, establish a breach of fiduciary duty. Indeed, according to the testimony, Ronald Belfon had no role in obtaining the bond and the only officers or agents with authority to send financial information to the bonding company were Eleanor Garcia, Verne David, and Angela Belfon. (A. Belfon Dep. 38:307; Maduro Dep. #2 69:1-70:8.) Felicia Maduro was the one responsible for filling out the bond renewal applications. (Garcia Dep. 89:6-10.) Thus, the Court declines to grant summary judgment against Ronald Belfon on this ground.

<u>Active Involvement in WWT's Administrative and Financial
Management</u>

Second, Plaintiff contends that Ronald Belfon was actively involved in WWT's

administrative and financial management, as follows:

> WWT became accredited to ARC in August, 1999 – a fact known to Mr. Belfon
> since he notarized the ARP to ARC Conversion Agreement. . . . Mr. Belfon
> certified to IATAN and verified under oath that he devoted at least 20 hours per
> week, each and every week, 52 weeks per year, to the "business of the agency".
> Mr. Belfon admitted he reviewed the February 2002 loan package from Banco
> Popular, which included the Closing Cost Summary and Disbursement
> Authorization showing how the funds were applied. Mr. Belfon verified that he
> spent 7-10 hours each week working with WWT on collections, contracts,
> personnel matters, and vendors, and more than 100 hours (3 hours a week)
> between June 2001 and June 2002 dealing with Winston Williams' allegations of
> financial malfeasance. . . . Mr. Belfon's testimony and sworn statements are
> consistent with Mrs. Belfon's admission that she prepared a Statement of
> Ownership for ARC in June 2001 in which she represented to ARC that Ronald
> Belfon and Verne David each devoted 35 hours per week to the business of the
> agency. . . .

(Pl.'s Reply Br. 11 (citations to evidence omitted).)

While none of this specific evidence is contradicted, significant other evidence exists to

create a genuine issue of material fact as to Ronald Belfon's active involvement in a breach of

fiduciary duty regarding the administrative and financial operation of WWT. Ample evidence

exists that Ronald Belfon's work for WWT was limited to only legal matters. Mr. Belfon stated

that during all relevant periods, he acted as WWT's attorney in various respects. (Ex. 15,

Response to Interrogatory No. 1; R. Belfon Dep. 111:5-13.) Moreover, according to Felicia

Maduro, Mr. Belfon worked as the legal advisor for the business if there was any litigation or

threatened litigation – which would include the Winston Williams litigation. (Maduro Aff. ¶ 8.)

Ms. Garcia listed Ronald Belfon on the IATAN forms as an independent contractor based upon his work soliciting customers and the legal work he did for WWT. (Garcia Aff. ¶ 10.) Both Ms. Maduro, WWT's general manager, and Ms. Garcia, WWT's bookkeeper, averred that Mr. Belfon rarely came to the business office of WWT, had absolutely no involvement in the financial aspects of WWT, such as the reporting to ARC or the accounting of ticket sales, and did not remove any funds for his personal use. (Maduro Aff. ¶¶ 5-6, 10; Garcia Aff. ¶¶ 5-8.) He also did not have any check-writing authority, as that authority was vested solely in Angela Belfon and Verne David. (Maduro Dep. #2 96:15-24; Pl.'s Reply to R. Belfon's Additional Facts ¶ 139.)

### Use of Status as a Director to Control WWT During Bankruptcy

Third, Plaintiff alleges that Ronald Belfon took part in WWT's decision to file a chapter 11 petition and showed his influence and controlling role repeatedly at the November 14, 2002 Section 341 meeting. Plaintiff cites to repeated occasions wherein Mr. Belfon purportedly "controlled the financial information that Mrs. Belfon and Ms. Maduro were permitted to disclose" and interjected in questioning to the other WWT witnesses. (Pl.'s Reply Br. 12-13.)

While such evidence is certainly probative of Ronald Belfon's involvement in one of WWT's bankruptcy meetings, it does not demonstrate his control over WWT's financial and administrative operations, such that he can be held responsible for WWT's actions during the relevant time period. Indeed, as aptly noted by Defendants, nothing the transcript quoted by ARC reflects that Ronald Belfon was involved in WWT's operations or that he participated in any of WWT's torts.

Giving of False Testimony to Obstruct ARC's Claim to the
Remaining Proceeds in WWT's Designated Account

Finally, ARC argues that Ronald Belfon misrepresented to the bankruptcy court that

WWT had no escrow account. Specifically, when asked if WWT ever maintained a trust

account, Mr. Belfon responded that, "we never considered any of the accounts to be trust

accounts, except in the case of the government funds, we considered that to be not a trust account

but an escrow account. But other than that none of the – none of the accounts were considered

trust accounts and no other accounts were considered even escrow accounts." (Ex. 29, at 69-70.)

Subsequently, however, Ms. Maduro indicated that WWT did maintain what it "normally" called

an escrow account "because everything was being lumped into that account and then transferred

to the operating. We were trying to differentiate which account was which. That's all that was."

(Maduro Dep. 104-05.)

Again, however, a genuine issue of material fact exists as to whether WWT ever

maintained an escrow account. As set forth above, WWT maintained two checking accounts at

BPPR. In the QuickBooks system, BPPR account #193-331879 was labeled an "escrow

account" and BPPR account #193-333671 was labeled an "operating account." (Maduro Dep.

30:2-24, 36:9-13 & Exs. 6-7; David Dep. 63:15-64:15; A. Belfon Dep. 83:23-84:3.) Testimony

from both BPPR's Vice President and Commercial Manager for Tortola and St. Croix and

BPPR's Vice President and Manager of Credit Administration indicated, however, that they were

not aware of any "special" or escrow accounts, that they understood both accounts to actually be

operating accounts, and that neither was an escrow account, regardless of how the account was

actually labeled by WWT. (Olive Dep. 8:4-7, 47:2-48:2, 49:18-20; Green Dep. 7:12-15, 24:6-

79

26:9.)

Conclusion as to Ronald Belfon

In short, while the record contains some evidence demonstrating Ronald Belfon's

involvement in the affairs of WWT and potentially implicating him in a breach of fiduciary duty,

the evidence cannot be viewed in a vacuum. Plaintiff fails to recognize the contradictory

evidence – be it credible or not – suggesting that Mr. Belfon served solely as a legal advisor,

played no role in the administrative and financial affairs of the company, and was completely

uninvolved in any of WWT's misappropriations or failures to honor its obligations under ARA.

The Court simply cannot resolve these factual disputes at this juncture and must, as a result, deny

Plaintiff's Motion for Summary Judgment on this point.

**2.      Conversion and the Participation Theory of Liability**

Plaintiff also seeks summary judgment against all Defendants on the theory that they were

active participants in the tort of conversion. "Under Virgin Islands law, '[c]onversion is an

intentional exercise of dominion or control over a chattel which so seriously interferes with the

right of another to control it that the actor may justly be required to pay the other the full value of

the chattel.'" Addie v. Kjaer, No. CIV.A.04-135, 2009 WL 482497, at *4 (D.V.I. Feb. 23, 2009)

(quoting RESTATEMENT (SECOND) OF TORTS § 222A (1965)). "Money is a chattel that may be

the object of a conversion." Id. (citing Chase Manhattan Bank, N.A. v. Power Prods., 27 V.I.

126, 129 (Terr. Ct. 1992)).

The question then becomes whether an officer or director of a corporation may be held

responsible for an act of conversion by that corporation. "[W]hile an officer of a corporation is

80

in no way personally liable for corporate torts solely on account of his corporate position, where the officer actually participates in or otherwise sanctions the tortious acts, personal liability may lie." Ellison, 296 F.3d at 271. This so-called "participation theory" has been adopted by courts within the Virgin Islands.[40] Addie, 2009 WL 1140006 at *3. "The Restatement clearly articulates [that] . . . a corporate agent may be personally liable in tort if, although acting on behalf of a corporate entity, he directs or participates in the tortious act." Id. This theory reigns in the majority of other United States jurisdictions. Id. (surveying case law); see also Key Corporate Capital, Inc. v. Tilley, 216 Fed Appx. 193, 195 (3d Cir. 2007) (recognizing that, pursuant to Pennsylvania law, "[u]nder the officer participation theory, corporate officers who take part in the commission of a tort by a corporation face personal liability."). The mere fact that the tort occurred during a breach of contract between the corporation and the plaintiff is of no moment; "[t]he Restatement . . . unambiguously demonstrates that a corporate agent may be held liable for a tort he personally commits in violation of his principal's contract with the plaintiff. The Restatement does not bar such a tort claim merely because the agent's tort runs afoul of contractual duties the principal owes the plaintiff." Addie, 2009 WL 1140006, at *5.

Given the Virgin Islands's adoption of the participation theory, mere nonfeasance by a corporate officer or director does not give rise to liability. Thus, corporate officers cannot be held liable for the alleged torts committed by the corporation simply by virtue of their positions. McCracken v. Daimler Chrysler Motors Co. LLC, No. CIV.A.07-2202, 2008 WL 920344, at *2

---

[40] Notably, this theory applies to any claims that the Defendants breached a "corporate" fiduciary duty, *i.e.* one owed by WWT as trustee of the ticket proceeds for the benefit of ARC and the carriers.

(E.D. Pa. Apr. 3, 2008) (noting that Pennsylvania's adoption of a participation theory of liability requires active participation by a corporate officer or director in a corporation's torts). Failure to prove that a corporate officer was an active participant is fatal to a claim against a corporate officer. Id.

Plaintiff's request for summary judgment on the claim of conversion is limited to a legal description of the tort of conversion together with the one sentence allegation that Defendants engaged in the "unauthorized diversion of ARC's proceeds to pay other obligations of WWT, including, but not limited to, defendants' own compensation and repayment of shareholder loans." (Pl.'s Mem. Supp. Mot. Summ. J. 15-16.) Plaintiff fails to apply the law to the facts and lumps all three Defendants together, with no showing of their individual liabilities. Plaintiff's Reply Brief completely ignores this issue. Having already found genuine issues of material fact as to all three Defendants' breach of fiduciary duty, the Court cannot conclude that Plaintiff has met the heavier burden of showing these Defendants' active participation in the misdeeds of WWT. Accordingly, Plaintiff's Motion for Summary Judgment is likewise denied

## D.   Conclusion as to Plaintiff's Motion for Summary Judgment

Having thoroughly reviewed the record in this case, the Court recognizes that Plaintiff offers compelling evidence of Defendants' liability. Federal Rule of Civil Procedure 56, however, does not allow the Court to turn a blind eye to the substantial – if not as compelling – contrary evidence provided by Defendants. Ultimately, credibility determinations and weighting of evidence must be performed by a jury not and decided on a legal basis. As such, the Court denies Plaintiff's Motion for Summary Judgment.

## VI. DEFENDANT RONALD BELFON'S MOTION FOR SUMMARY JUDGMENT

The final dispositive motion pending before the Court is that of Defendant Ronald Belfon. Mr. Belfon seeks summary judgment on Plaintiff ARC's claims for: (1) breach of fiduciary duty; (2) conversion; (3) fraud; (4) common law conspiracy; (5) breach of corporate fiduciary duty; and (6) tortious interference with contract. For its part, Plaintiff alleges that summary judgment is improper because Ronald Belfon was a central figure in WWT's torts; helped WWT issue false and misleading financial statements to obtain its ARC bond; knew or should have known, as of February 2002, that WWT was insolvent; personally benefitted from WWT's conversion of ARC's proceeds to fund its operating expenses; and tortiously interfered with ARC's valid claim to the bond proceeds by making misrepresentations to USF&G and ordering a stop payment on ARC's debit. Keeping in mind the factual findings and conclusions the Court has already reached with respect to the prior motions, as well as the previously-described standard of review, the Court now turns to the issues at hand.

### A. Evidentiary Objection to the Declaration of Ronald Belfon

As with Plaintiff's Motion for Summary Judgment, the Court must first resolve one preliminary evidentiary issue. In support of his Motion, Ronald Belfon provides a Declaration, signed on May 14, 2010, effectively denying any role in any wrongdoing by WWT and blanketly stating that he did not commit any of the torts alleged against him. Plaintiff now contends that this affidavit is inadmissible because it violates Rules 56(e) and (g) of the Federal Rules of Civil Procedure and is impermissible under the sham affidavit rule. Further, Plaintiff seeks attorneys fees and costs, under Rule 56(g), in connection with its objections to this affidavit.

Rule 56(e)(1) states in pertinent part that, "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." FED. R CIV. P. 56(e)(1). As explained above, under the"sham affidavit" rule, "[a] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004) (citing Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991)). The court will disregard "an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony." Baer, 392 F.3d at 624 (internal quotation marks omitted). Otherwise, "the objectives of summary judgment would be seriously impaired if the district court were not free to disregard the conflicting affidavit." Martin v. Merrell Dow Pharms., Inc., 851 F.2d 703, 706 (3d Cir. 1988). Only when there is independent evidence in the record to bolster a questionable affidavit, may the court consider the document. Baer, 392 F.3d at 625. Moreover, "articulating legal conclusions rather than setting forth the facts upon which conclusions are based, does not meet the requirements of Rule 56(e)." Wire Mesh Prods., Inc. v. Wire Belting Ass'n, 520 F. Supp. 1004, 1008 (E.D. Pa. 1981) (internal footnotes omitted).

Mr. Belfon's affidavit can be divided into two categories of assertions. The first are a series of factual assertions that claim that he: was not an officer or director in any meaningful sense; played no role in WWT's management and was not privy to its financial affairs; played no role in reporting sales to ARC and was not a signatory on any corporate account; did not make any material misrepresentations to ARC; had limited involvement with WWT as an outside

attorney until the bankruptcy; did not take, accept, or receive money from WWT that actually belonged to ARC to the airlines; was not involved in any decision on the part of WWT relevant to ARC's payment and reporting claims; did not make any decisions with regard to distributing the $1,953.80 referenced in the Complaint; was not aware of any objection ARC raised to any distributions or expenditures while WWT was in Chapter 11; did not make any decisions with regard to reimbursing ARC for the $72,149.39 referenced in the Complaint; did not make any decision with regard to reimbursing ARC for the $431,200.25 in reported sales referenced in the Complaint; was not involved in the stop-payment order to Banco Popular; did not make decisions with regard to reporting any ticket sales; was not aware that WWT was insolvent until it filed for bankruptcy; and did not make, participate in, or encourage any decisions regarding paying or not paying WWT's creditors at any time. (Ex. 44, Decl. of Ronald Belfon ¶¶ 3-9, 12-19, May 14, 2010 ("R. Belfon Decl.").) Further, he averred that no WWT corporate funds came into his hands for the purpose of making distribution or payments to WWT's creditors and any payments he received indirectly as rent or loan repayments were lawful and proper. (Id. ¶ 31.) The Court finds that such assertions are based on Mr. Belfon's personal knowledge. To the extent, however, that they are contradicted by any of his previous deposition testimony, they will not be considered in support of his summary judgment claim. To the extent, that Plaintiff can identify no contradictory deposition testimony from Mr. Belfon, these declarations will be taken as part of the summary judgment record and considered in conjunction with the remainder of the evidence.

The second category of assertions in Mr. Belfon's affidavit propounds a series of legal conclusions. Specifically, he avers that: he did not do anything wrong or participate in any decision that caused legal harm to ARC or the airlines; was not aware of or participate in any

breach by WWT of any fiduciary duty owed to ARC; did not personally cause ARC or the airlines to suffer any damages; did not deprive or participate in depriving ARC of the use of any of its property, chattel, or funds; was not aware of and did participate in or encourage any conversion of ARC's funds; was not aware of or participate in WWT making false or fraudulent statements by WWT to ARC; did not make any statements to ARC that were false; did not enter into any unlawful agreements with anyone; did not commit any unlawful overt act in furtherance of any conspiracy; did not participate in any unlawful plan; did not participate in or commit an underlying tort; did not use or misuse any corporate funds; did not have the specific intent to cause any harm to ARC with regard to any action that he took in connection with notifying USF&G of the existence of the automatic stay; and, using his business judgment and considering his duties as an officer of the court, was justified in any action he took with regard to notifying USF&G of the existence of the automatic stay and the possible consequences of a violation. (R. Belfon Decl. ¶¶ 10-11, 20-30, 34-35.) These allegations are nothing more than legal conclusions that are clearly not within the personal knowledge Defendant Belfon. To accept such allegations as true would effectively usurp the role of both judge and jury and allow a party to simply declare himself innocent of all charges levied against him. As Rule 56(e) clearly does not encompass such allegations, the Court will disregard them for purposes of summary judgment.

To the extent Plaintiff now seeks attorney's fees and costs under Rule 56(g) as a result of this "sham affidavit," however, the Court denies this request. Rule 56(g) states that, "[i]f satisfied that an affidavit under this rule is submitted in bad faith or solely for delay, the court must order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result." FED. R. CIV. P. 56(g). The Rule mandates that this Court

be satisfied that the affidavit was submitted in bad faith or intent to delay. Plaintiff has provided no such showing of bad faith. Moreover, it is not clear what, if any, expenses Plaintiff has incurred as a result of the filing of this affidavit. As such, no such award is warranted.

**B.     Whether a Genuine Issue of Material Fact Exists as to Ronald Belfon's Liability**

As noted above, Ronald Belfon challenges Plaintiff's allegations against him of: (1) breach of fiduciary duty; (2) conversion; (3) fraud; (4) common law conspiracy; (5) breach of corporate fiduciary duty; and (6) tortious interference with contract. For ease of discussion, the first summarizes all of the evidence produced by Plaintiff against Ronald Belfon and then applies those facts to the elements of each of the above claims.[41]

**1.     Summary of Evidence Regarding Belfon's Involvement**

Disregarding the parties conclusory allegations and unsupported inferences, the following summary encapsulates the core of the evidence regarding Ronald Belfon:

- On August 24, 1999, Defendant Angela Belfon executed Ronald Belfon's name on an indemnity agreement designed to obtain WWT's bond from USF&G. (A. Belfon Dep. 11:1-22; Filice Dep. 8:15-16:4 & Ex. 1; R. Belfon Dep. 18:1-19:7, 20:3-6.) Ronald Belfon otherwise had no role in obtaining the bond and had no access or authority to send financial information to the bonding company. (A. Belfon Dep. 38:3-7; Maduro Dep. #2 69:1-70:8.)

- Prior to WWT's filing for bankruptcy in 2002, Ronald Belfon had no knowledge of the reporting process by which WWT would report sales to ARC. (R. Belfon Dep. 44:1-25.)

---

[41] The parties briefs with respect to this Motion are replete with case citations that are usually ill-explained and often only tangentially applicable. Accordingly, in lieu of individually discussing or distinguishing each individual case cited by the parties, the Court will reference only those cases it deems applicable and worthy of further consideration in connection with the present issues.

- During the periods relevant to this case, Ronald Belfon acted as WWT's attorney with respect to debt collections both by and from the agency. (Ex. 15, Resp. to Interrogatory No. 1.) Mr. Belfon also provided advice regarding the legal status and rights of parties in the Travel and Tourism Academy, which was operated under a related corporation. (Id.) Finally, he provided advice and reviewed documents involving Winnair, a foreign commuter airline that use WWT as its local agent. (Id.) Generally, Mr. Belfon worked as the legal advisor for the business if there was any litigation or threatened litigation, but it did not involve financial matters. (Maduro Aff. ¶ 8.)

- Ronald Belfon held a valid travel agent ID card from IATAN. (PSUF Ex. 16, Thompson Dep. 21:20-24:15; R. Belfon Dep. 108:19-21.) To retain these cards, Mr. Belfon submitted a yearly renewal application certifying that he was either an employee or independent contractor of WWT that devoted at least twenty hours a week to the business of the agency in the preceding year. (Thompson Dep. 30:9-36:18, 40:25-43:22; R. Belfon Dep. 110:10-112:10 & Ex. 142.) Mr. Belfon was listed as an independent contractor based on his work soliciting customers and the legal work he did for WWT. (Garcia Aff. ¶ 10.) Mr. Belfon conceded that he devoted at least twenty hours per week to WWT's business and received at least $5,000 a year in compensation. (R. Belfon Dep. 110:7-19.) His twenty hours were devoted strictly to legal work. (Id. at 111:5-13.)

- By all accounts, and with no contradictory testimony, Mr. Belfon rarely came to the business office of WWT, had no involvement in the financial aspects of WWT, and, according to the bookkeeper and financial manager, did not remove any funds for his personal use. (Maduro Aff. ¶¶ 5-6; Garcia Aff. ¶¶ 5-8.) He had no check-writing authority and bookkeeper Eleanor Garcia understood that he had no financial or management interest in the company. (Maduro Dep #2 96:15-24; Pl.'s Reply to R. Belfon's Additional Facts ¶ 139; Garcia Dep. 112:1-113:19.)[42]

---

[42] In ARC's Additional Statement of Facts in Opposition to Ronald Belfon's Motion for Summary Judgment, it alleges that "WWT used the converted ARC proceeds to fund all of its normal operating expenses from April 2002 until the filing of the chapter 11 petition on August 8, 2002. WWT used ARC's proceeds to make monthly mortgage payments to Banco Popular for the residence occupied by Mr. and Mrs. Belfon, to pay the monthly rent to KLB Realty, LLC, an entity that is solely owned by Mr. Belfon, and to renew the IATAN certificates, including the certificate that provided Mr. Belfon with 75% travel discounts." (ARC Resp. To R. Belfon's Statement of Undisputed Facts in Support of Motion for Summary Judgment ¶ 80.) The evidence cited in support of this paragraph, however, provides absolutely no proof of this allegation.

- During the first audit, Angela Belfon provided the ARC auditors with an executed Statement of Ownership form identifying Ronald Belfon as one of the owners, along with Angela Belfon and Verne David. (A. Belfon Dep. Ex. 103.) Although that document originally listed Mr. Belfon as doing thirty-five hours per week of work for the agency, those numbers were inexplicably crossed off. (Id. at 76:14-20 & Ex. 103.)

- During the period of March 19, 1999 to May 30, 2001, WWT issued checks totaling $46,000 payable to "Ronald and Angela Belfon" as "loan reimbursement."[43] (Id. at 42:5-45:1 & Ex. 1.) Angela Belfon testified, however, that she alone made the loan to WWT. (Id. at 42:5-45:1, 50:2-51:6.) Ronald Belfon also indicated that he first heard about this loan in the context of this lawsuit. (R. Belfon Dep. 24:7-23.) Plaintiff's expert could not verify who supplied the $92,000 "stockholder loan," (O'Connell Dep. 32:2-19), and Garcia never saw any expenditures to Ronald belfon when preparing WWT's year-end reports. (Garcia Dep. 113:11-114:15.)

- Prior to Joanne Williams's death in 1997, Ronald Belfon was a full and active participant in any discussion about WWT's financial condition and the various plans to obtain financing for WWT. (Williams Dep. 114:1-4.) After her death, Winston Williams filed a lawsuit against WWT regarding a loan from Joanne Williams to WWT. Ronald Belfon was the "active participant" at every meeting regarding the amounts Mr. Williams claimed were due to him. (Id. at 37:1-9.)

- When Angela Belfon entered into a $266,000 loan agreement with BPPR secured by a second mortgage on her home with Ronald Belfon, Ronald Belfon signed the mortgage to convey his spousal homestead rights to the mortgagee, but never asked about the purpose of the loan or why WWT need the money. (A. Belfon Dep. 48:14-19, 111:20-24 & Ex. 32; R. Belfon Resp. To PSUF ¶ 76; R. Belfon Dep. 25:10-26:6.) Ronald Belfon received a loan package on February 5, 2002 revealing that the proceeds were used to refinance WWT's accumulated and unsecured debts and to pay of WWT's $95,128.65 overdraft. (R. Belfon Dep. 27:15-28:13.)

- ARC auditor Jones could not recall being given any information that Ronald Belfon had any knowledge of the financial dealings of WWT, other than what Angela Belfon told Jones about Mr. Belfon's working for the agency thirty-five hours per week, most of which was outside the agency. (Jones Dep. 111:2-18.)

---

[43] As noted above, Felicia Maduro's testimony that Angela Belfon told her that these checks were repayment of a loan from her husband are inadmissable hearsay against Ronald Belfon. (Maduro Dep. 54; Maduro Dep. #2 78:1-79:22.)

- Angela and Ronald Belfon jointly discussed and ultimately decided that WWT would file a Chapter 11 Petition in Bankruptcy. (R. Belfon Dep. 42-43.) Although Mr. Belfon admitted to originally contacting WWT's chapter 11 counsel, Benjamin Currence, Mrs. Belfon testified that she never discussed any of her meetings with Mr. Currence regarding the WWT bankruptcy with Mr. Belfon. (Id. at 45:1-22; A. Belfon Dep. 167:14-169:3.) Mr. Belfon was possibly involved in some unspecified manner with the preparation of WWT's documents. (Garcia Aff. ¶ 9; R. Belfon Dep. 54:17-58:8.)

- During the Section 341 meeting of creditors on November 14, 2002, Ronald Belfon attended the meeting to answer questions and responded to many of the questions about WWT's activity and financial status. He denied, however, that he had any involvement with assisting in WWT's business. (Ex. 29.) He repeatedly confirmed his authority as an officer and director of WWT. Id.

- At the Section 341 meeting, Mr. Belfon represented that WWT never considered any of the accounts it held to be trust accounts and no other accounts were considered escrow accounts. (Id. at 70:2-25.)

- Ronald Belfon admitted to the Chapter 7 Trustee that WWT had been using proceeds from sales of airline tickets to pay operating expenses, but he did so without any specificity as to who was responsible and what type of operating expenses were paid. (Id. at 31-32.)

- On January 14, 2003, Mr. Belfon represented to USF&G that ARC was facing liability to WWT for violations of the automatic stay that would exceed the value of the bond. (Ex. 53.) In making this statement, he reviewed treatises and handbooks, old bankruptcy cases in which he had been involved, and portions of bankruptcy newsletters or periodicals, but did not investigate any facts; he went only on information given to him without any independent investigation. (R. Belfon Dep. 72:6-8, 75:1-76:8.) It was not until April 29, 2003 that USF&G accepted ARC's claim.

## 2. Breach of Fiduciary Duty

As set forth above, it is well-established that Ronald Belfon, as a titular director of WWT possessed fiduciary duties to ARC both under an express trust and as a director of an insolvent

corporation.[44] While the former duty requires consideration of the participation theory, the latter

duty imputes a fiduciary duty directly onto Mr. Belfon. McCracken, 2008 WL 920344, at *2.

Accordingly, for purposes of this Motion, the Court considers only whether Ronald Belfon has

breached his personal fiduciary duty as a director of an insolvent corporation.

The gist of Plaintiff's argument against Ronald Belfon is summarized as follows:

> The undisputed facts establish that WWT manipulated its sales reports to ARC so
> that it could withhold and convert ARC's proceeds, concealed its mounting debt
> to ARC with false and misleading financial statements, breached the ARA by
> placing a stop order on ARC's pre-authorized debits, which caused Banco Popular
> to dishonor ARC's August 7, 2002 draft for the July 28 report in the amount of
> $103,104.82, breached its fiduciary obligations as a debtor-in-possession to
> provide timely and accurate chapter 11 financial disclosures, and violated the
> bankruptcy court's order freezing the account containing the remaining ARC
> proceeds. WWT converted ARC's proceeds, before and after the chapter 11
> filing, and used the funds to renew Mr. Belfon's IATAN certificate, pay the
> Belfons' mortgage, and pay rent to Mr. Belfon's company, KLB Realty. Ronald
> Belfon was a central figure in WWT when all of the wrongful acts were
> committed. Ronald Belfon was also [an] active participant – indeed the lead
> conductor – of WWT's failed attempt to continue and cover up its wrongful
> actions immediately before and after the filing of the chapter 11 petition. Mr.
> Belfon gave false and misleading testimony about WWT's accounts and finances
> and obstructed the chapter 7 trustee in the performance of his duties at the Section
> 341 meeting of creditors.

(Pl.'s Resp. R. Belfon's Mot. Summ. J. 21.)

Given that the law regarding breach of fiduciary duty is ill-defined in the Virgin Islands,

the Court seeks guidance from other jurisdictions within the Third Circuit to determine whether

---

[44] To the extent Plaintiff relies, in its Response, on an aiding an abetting theory, such a theory is
irrelevant. The aiding and abetting theory applies where a non-fiduciary knowingly participated
in a breach by a fiduciary or where the abetting was done by a fiduciary whose duties are limited
by, for example, corporate charter and who, in that instance, did not have a duty. See In re The
Brown Schools, 368 B.R. 394, 402-03 (Bankr. D. Del. 2007). As set forth above, Mr. Belfon, as
a director of an insolvent corporation, had a fiduciary duty to creditors of the corporation.

such allegations suffice to survive summary judgment. Surveying the three other states in the Third Circuit reveals that a corporate director's fiduciary duty goes beyond merely avoiding participation in misdeeds. In Delaware, a claim for breach of loyalty may be premised upon the failure of a fiduciary to act in good faith. Stone ex rel. Am. South Bancorporation v. Ritter, 911 A.2d 362, 370 (Del. 2006). "[T]he fiduciary duty of loyalty . . . encompasses cases when the fiduciary fails to act in good faith. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." In re Bridgeport Holdings, Inc., 388 B.R. 548, 564 (Bankr. D. Del. 2008) (quoting Stone, 911 A.2d at 370). Similarly, in Pennsylvania, the standard used to determine whether an officer or director breached his or her fiduciary duty is whether he or she performed "his or her duties in good faith and in a manner reasonably believed to be in the best interest of the corporation. The director must utilize such care, skill and diligence as would a person of ordinary intelligence under similar circumstances." In re Forman Enter., Inc., 281 B.R. 600, 610 (Bankr. W.D. Pa. 2002). "This duty of loyalty obligate[s] them to devote themselves to the affairs of the corporation with a view towards promoting the interests of the corporation." In re Insulfoams, Inc., 184 B.R. 694, 707 (Bankr. W.D. Pa. 1995), aff'd, Donaldson v. Bernstein, 104 F.3d 547 (3d Cir. 1997). The law thus "imposes a duty of reasonable care on all directors, regardless of whether they are responsible for managing a corporation's day-to-day affairs." Main, Inc. v. Blatstein, No. CIV.A.98-5947, 1999 WL 424296, at *19 (E.D. Pa. Jun. 23, 1999); see also Richard Royce Collections, Ltd. v. New York City Shoes, Inc. ( In re New York City Shoes, Inc.), 84 B.R. 947, 958 (Bankr. E.D. Pa. 1988) (explaining that "corporate directors in even close, family-owned corporations are liable if

they act in such a way as to profit their individual and other corporate enterprises at the expense

of the corporation in issue"). New Jersey law is in accord and confirms that "[a] director is not

an ornament, but an essential component of corporate governance" and "dummy, figurehead and

accommodation directors are anachronisms with no place in New Jersey law." Francis v. United

Jersey Bank, 432 A.2d 814, 823 (N.J. 1981). In other words, under generally accepted legal

principles, because every director has the "positive duty to manage the affairs of the corporation,"

a director can be held liable for breaching her fiduciary duty if he/she failed "to take positive

steps to correct an illegal corporate action." Metzger v. American Food Mgmt., Inc., 389 F.

Supp. 469, 471 (W.D. Pa. 1975).

Taking the facts in the light most favorable to the non-moving party, *i.e.* ARC, the Court

must find that a genuine issue of material fact exists as to Ronald Belfon's breach of fiduciary

duty. Although Belfon was not involved in the day to day management of WWT and although

his participation in any potentially tortious financial decisions is questionable, he was a director

and the legal advisor to the corporation during the entire time of WWT's misappropriation of

funds. His name was executed, with his authorization, on the indemnity agreement to the bond

company and he represented to IATAN that he engaged in work for WWT for at least twenty

hours each week. Evidence exists that he was aware of some of WWT's financial difficulties,

even authorizing a loan to the corporation with his home as collateral. The loan package, which

he admits he received, revealed that the proceeds were used to refinance WWT's accumulated

and unsecured debts and to pay of WWT's $95,128.65 overdraft. Another "stockholder loan" –

one purportedly made solely by Mrs. Belfon – was nonetheless repaid with checks made out to

both Ronald and Angela Belfon, with no explanation as to why his name was included. Finally,

he admittedly participated in the decision to have WWT file for bankruptcy, suggesting that he was potentially aware of some of WWT's outstanding debts to ARC and its inability to pay them. On these facts, a factfinder could determine that Ronald Belfon failed in his duty as a director of WWT to take positive steps to correct an illegal corporate action.

Accordingly, a genuine issue of material fact exists as to whether Ronald Belfon had reason to know of WWT's misfeasances and nonetheless failed to make appropriate efforts to correct them. In turn, the Court denies summary judgment on the breach of fiduciary duty claim..

### 3. Conversion, Fraud, Common Law Conspiracy, Breach of Corporate Fiduciary Duty, and Tortious Interference with Contract

Finally, Defendant Ronald Belfon seeks summary judgment on all of the tort claims against him, including conversion, fraud, common law conspiracy, breach of corporate fiduciary duty, and tortious interference with contract. On these issues, summary judgment is warranted.

The Court need not delve into the individual elements of any of these causes of action as they all share one common element – an element on which Plaintiff has failed to establish a genuine issue of material fact.[45] As set forth in detail above, and as the Court now reiterates for the third time, the Virgin Islands has expressly adopted the theory that "a corporate agent may be personally liable in tort if, although acting on behalf of a corporate entity, he directs or participates in the tortious act." Addie, 2009 WL 1140006, at *3. As aptly defined by Pennsylvania law:

---

[45] Notably, Plaintiff does not set forth the elements relating to or otherwise address Defendant Belfon's Motion for Summary Judgment as to the fraud and common law conspiracy claims. Nor does this Court find that the elements of these claims have been met.

94

The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done or participated, or cooperated therein.

Liability under this theory attaches only where the corporate officer is an actor who participates in the wrongful acts. Therefore, corporate officers may be held liable for misfeasance . . . [but] may not be held liable for mere nonfeasance.

In re Uni-Marts, LLC, 404 B.R. 767, 784 (Bankr. D. Del. 2009) (quoting Wicks v. Milzoco Builders, Inc., 470 A.2d 86, 90 (Pa. 1983)). Thus, in order to prove liability, the plaintiffs must establish that each defendant director or officer "active[ly] participat[ed] in a positively wrongful act intendedly and directly operating injuriously to the prejudice of the [plaintiffs]," Thompson v. Glenmede Trust Co. No. CIV.A.92-5233, 1993 WL 197031, at *9 (E.D. Pa. Jun. 8, 1993) (internal quotations omitted), or that the corporate officer was "an active and knowing participant in the alleged tortious activity." McCracken, 2008 WL 920344, at *3. "Allegations that a corporate officer was charged with the general supervision of a corporation's affairs are insufficient to hold a corporate officer individually liable."[46] Id.

---

[46] Plaintiff repeatedly cites to Fraternity Fund Limited v. Beacon Hill Asset Mgmt LLC, 479 F. Supp. 2d 349, 360 (S.D.N.Y. 2007) and The Lautenberg Foundation v. Madoff, No. CIV.A.09-816, 2009 WL 2928913 (D.N.J. Sep. 9, 2009) for the proposition that the Court must use a "conscious avoidance" standard to impose liability on a director only when it can be said that the director actually knew about wrongdoing because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge. Fraternity Fund, 479 F. Supp. 2d at 368. Plaintiff, however, has not identified any case to show that this conscious avoidance standard is applicable outside of a claim for aiding and abetting breach of fiduciary duty and would suffice to implicate a corporate director for torts by the corporation.

In this case, Plaintiff has, at most, proven that Ronald Belfon was a director of WWT, functioned as a legal advisor, and knew generally of WWT's financial troubles during the relevant time period. Even taking all of its alleged facts as true, the Court is hard-pressed to find any active participation – something beyond mere nonfeasance – by Defendant Belfon in any of the alleged torts. Nothing in the evidence reveals that Belfon had any role whatsoever in WWT's failure to pay ARC for unreported sales, failure to report sales, or wrongful distribution of money. Nor does the evidence show that Ronald Belfon was even aware of either the reporting system used by WWT or the precise obligations WWT had to ARC under the ARA. The evidence does not reflect that Ronald Belfon had any role in using WWT funds to pay for his IATAN certificate or pay rent on WWT's building – indeed he was not even an authorized signatory on the accounts. As to the stop payment order, although Defendant David testified that Angela Belfon told him the stop payment was to be done "on advice of counsel," not one shred of evidence suggests that it was Ronald Belfon who gave such advice. While Ronald Belfon wrote to USF&G in January 2003, five months after the stop check order was issued, explaining that WWT's account was not dishonored for insufficient funds, that statement does not create any reasonable inference that he authorized or participated in the order. Finally, Mr. Belfon's "active" role during the Section 341 meeting of creditors in November of 2002 – an event occurring well after any of the alleged torts – bolsters his testimony that he functioned solely in a legal capacity for WWT and had no active role in the financial or management end of the corporation. In short, in light of the absence of evidence that Mr. Belfon knew about, participated in, or was even kept informed about WWT's financial affairs, no reasonable factfinder could conclude that he was a "guiding spirit" or "knowing participant" in any of

WWT's torts.

The sole tort requiring individual discussion is that of tortious interference with ARC's

bond claim. According to Plaintiff, on January 14, 2003, Mr. Belfon represented to USF&G that

ARC was facing liability to WWT for violations of the automatic stay that would exceed the

value of the bond. (Ex. 53.) Specifically, Mr. Belfon wrote, in part, as follows:

> World Wide Travel filed its Chapter 11 case on August 8, 2002. Consequently,
> any claim filed against its bond was in violation of the automatic stay of all debt
> collection proceedings. The automatic stay was issued by the bankruptcy court on
> August 8, 2002 and to this date has not been modified, lifted or vacated in any
> way. In fact, ARC has not requested that the court lift the automatic stay. On the
> date ARC delivered to your offices its October 16th claim, WWT was a chapter 11
> debtor and protected by the automatic stay. The bankruptcy court may award
> WWT damages for this violation and other committed by ARC. In addition to
> damages, the court may award attorneys fees for the violation and even punitive
> damages. It is possible, therefore, that not only might ARC not be entitled to
> payment under the bond; it may be liable to World Wide Travel for amounts in
> excess of the penal sum of fifty thousand dollars, due to its violations.

Id. ARC now argues that by sending this letter, Ronald Belfon interfered with ARC's

contractual right to be promptly paid for its valid claim under the bond contract by making that

performance more expensive and more burdensome.

The Restatement (Second) of Torts, which governs this case, provides:

> One who intentionally and improperly interferes with the performance of a
> contract (except a contract to marry) between another and a third person by
> inducing or otherwise causing the third person not to perform the contract, is
> subject to liability to the other for the pecuniary loss resulting to the other from
> the failure of the third person to perform the contract.

RESTATEMENT (SECOND) OF TORTS, § 766 (1979). "In order to state a cause of action for a tort

under this section, one must allege that there was an existing contract, that the alleged tortfeasor

had knowledge of the existing contract, that the alleged tortfeasor's actions were the proximate cause of the third person's failure to perform, and that the tortfeasor's actions were intentional, improper, and caused damages." Govt. Guar. Fund of Republic of Finland v. Hyatt Corp., 955 F. Supp. 441, 452 (D.V.I. 1997). "The second restatement sets out some of the factors that should be balanced to determine whether the alleged conduct is improper, without giving any guidance on which party has the burden on each factor." Id. These factors include: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the societal interests in protecting the freedom of action of the actor, (f) the contractual interests of the other, and (g) the relations between the parties." Id. (citing RESTATEMENT (SECOND) OF TORTS § 767). According to the Third Circuit, improper conduct must be either tortious, illegal, or wrongful by some measure external to the interference itself. Windsor Secs., Inc. v. Hartford Life Ins. Co., 986 F.2d 655, 664-65 (3d Cir. 1993).

In this case, Plaintiff has failed to establish how Mr. Belfon's notification of the bond company of potential consequences of any violation of the automatic stay was tortious, illegal, or otherwise wrongful. It has not demonstrated to the Court how the statements were inaccurate or reckless, how such statements were legally improper, or how Belfon's statements as an officer of the court were somehow false and deliberately misleading. Accordingly, the Court grants summary judgment in favor of Defendant Belfon on this claim.

**C.    Conclusion as to Ronald Belfon's Motion for Summary Judgment**

Given the findings set forth above, Ronald Belfon's Motion for Summary Judgment is granted in part and denied in part. While the evidence as to Ronald Belfon's involvement in

WWT is somewhat scant, the fact remains that he bore a fiduciary duty to Plaintiff. The pertinent jurisprudence suggests that he may be liable for nonfeasance under a breach of fiduciary duty theory. Such nonfeasance, however, is insufficient to establish Ronald Belfon's liability on any of Plaintiff's tort theories. Absent a least a modicum of evidence that Ronald Belfon actively participated in any of these torts, the Court must dismiss all of Plaintiff's remaining claims against him.

## VII.   CONCLUSION

Having entertained the parties' extensive motions, memoranda, and exhibits, the Court is left with but one conclusion – except for a few limited areas, genuine issues of material fact remain, precluding any resolution of this case on summary judgment. Although the parties ask the Court to make credibility determinations, such determinations are simply not permitted by the Federal Rules of Civil Procedure. As such, the Court enters an Order in accordance with the foregoing discussion and counsels the parties to begin trial preparation.